















JPP   11/22/05   14:18
3:04-CV-01200   PROMETHEUS LAB INC V. MAYO COLLABORATIVE
*227*
*O.*



1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  PROMETHEUS LABORATORIES, INC., | )  Civil No. 04cv1200 JAH (RBB) |
| 11                    Plaintiff, | )  **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 14] AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC # 135]** |
| 12  v. | ) |
| 13  MAYO COLLABORATIVE SERVICES dba MAYO MEDICAL LABORATORIES, | ) |
| 14 | ) |
| 15                    Defendant. | ) |
| 16 | ) |
| 17  AND RELATED COUNTER-CLAIM. | ) |

18                            **INTRODUCTION**

19        This matter is now before the Court on the parties' cross-motions for summary

20  judgment.  The parties' motions have been fully briefed and oral argument was entertained.

21  After a careful consideration of the pleadings and relevant exhibits submitted by the parties,

22  the oral argument presented at the hearing, and for the reasons set forth below, this Court

23  DENIES defendant's motion for summary judgment and GRANTS plaintiff's cross-motion.

24                            **BACKGROUND**

25  1.    **Factual Background**

26        Plaintiff is the exclusive licensee of two patents: U.S. Patent Nos. 6,355,623 ("the '623

27  patent") and 6,680,302 ("the '302 patent").  The patents-in-suit involve technology used in

28  blood tests for the treatment of patients with various inflammatory bowel diseases and other

                            227

autoimmune diseases. The patented technology provides the means for measuring the level of certain metabolites[1] in the blood in patients that were treated with thiopurine drugs, including the anti-Crohn's disease drug, azathioprine ("AZA"). The test using the patented technology ("the patented test") measures the level of two metabolites: 6-thioguanine ("6-TGN") and 6-methylmercaptopurine ("6-MMP"). The patented test for these metabolites measure patients' 6-TGN and 6-MMP, indicating that drug usage should be reduced at levels "greater than about 400" and "greater than about 7000," respectively, in order to avoid toxic side effects.

Defendant Mayo Collaborative Services dba Mayo Medical Laboratories ("defendant") developed a test ("the accused test") to measure the same metabolites but using different levels, 450 6-TGN and 5700 6-MMP. In June 2004, defendant announced it will begin to use its accused test, offering it for sale to potential purchasers.[2] The instant lawsuit followed.

## 2.     Procedural History

Plaintiff filed its patent infringement complaint on June 15, 2004. Defendant filed an answer to the complaint, along with a counterclaim, on October 6, 2004. Plaintiff filed an answer to the counterclaim on October 29, 2004.

Defendant filed its motion for summary judgment on January 27, 2005, with the hearing initially scheduled for March 27, 2005. Plaintiff, on February 17, 2005, filed an *ex parte* application seeking to continue the hearing date for defendant's summary judgment motion in order to allow for a *Markman* hearing to be conducted. Plaintiff's *ex parte* application was subsequently denied but the Court rescheduled the summary judgment motion hearing to April 7, 2005. The parties then stipulated to continue the hearing until April 21, 2005. Plaintiff filed its opposition to defendant's summary judgment motion on March 24, 2005, under seal. Defendant's reply brief was filed on March 24, 2005.

//

---

[1] Metabolites are compounds formed when the body breaks down a drug.

[2] Defendant explained, during oral argument, that it rescinded its announcement after the inception of this lawsuit and the accused test has not been implemented as of the date of the hearing.

On April 12, 2005, plaintiff filed objections to defendant's facts and evidence submitted in support of its motion for summary judgment. On April 21, 2005, defendant, in response, filed a motion to strike plaintiff's objections as untimely filed.[3] On April 15, 2005, plaintiff submitted an *ex parte* application for leave to file a sur-reply in further opposition to defendant's motion for summary judgment. Defendant opposed the *ex parte* request and plaintiff filed a reply to defendant's opposition to the request. The Court subsequently, on its own motion, rescheduled the April 21, 2005 motion hearing to June 16, 2005. Then, on May 12, 2005, the Court, again on its own motion, rescheduled the hearing until August 4, 2005.

On June 30, 2005, Magistrate Judge Ruben B. Brooks conducted a case management conference, during which the following orders were entered, among others:[4]

1. The hearing date on defendant's motion for summary judgment was rescheduled to September 15, 2005.
2. Plaintiff's cross-motion was set for hearing the same date and directed to be filed by August 4, 2005.
3. Plaintiff's request to file a supplemental opposition defendant's motion was granted and directed to be filed by August 4, 2005.
4. Defendant was granted the opportunity to file a supplemental reply to plaintiff's supplemental opposition. Defendant's supplemental reply and opposition to plaintiff's summary judgment motion was due by August 15, 2005.
5. Plaintiff's reply in support of its cross-motion was due by August 25, 2005.
6. Plaintiff's *ex parte* application to file a sur-reply was denied as moot.

Plaintiff filed its cross-motion, under seal, on August 9, 2005. On August 11, 2005, the Court, on its own motion, rescheduled the motion hearing on the cross-motions for summary judgment to September 29, 2005. Defendant filed an opposition to plaintiff's motion and a supplemental reply brief in support of its motion on August 19, 2005. Plaintiff filed its reply brief on September 2, 2005.

//

---

[3] Plaintiff filed its objections to the facts and evidence presented by defendant in support of its motion for summary judgment well after the deadline set for filing its opposition, in which such objections should have been presented. *See* CivLR 7.1(e.2). Plaintiff does not present any reason to excuse the untimely filing. Accordingly, defendant's motion to strike plaintiff's objections to defendant's facts and evidence [doc. # 73] is GRANTED.

[4] Judge Brooks also vacated the hearing date set for defendant's motion for leave to file an amended answer and counterclaim, taking that motion, along with plaintiff's motion seeking leave to file an amended complaint adding Mayo Clinic Rochester as a defendant, under submission without oral argument. The motions are currently pending before this Court.

3

This Court entertained oral argument by the parties on September 29, 2005. Prior to commencement of oral argument, the Court unsealed all documents sealed in conjunction with these motions. At the conclusion of the hearing the Court directed the parties to submit rebuttal and supplemental briefing. Defendant filed its rebuttal brief on October 3, 2005. Plaintiff's supplemental brief was filed on October 4, 2005 and its sur-rebuttal brief was filed on October 7, 2005. Defendant's response to plaintiff's supplemental brief was also filed on October 7, 2005. On October 14, 2005, defendant submitted an *ex parte* application seeking leave to file a supplemental response to plaintiff's Rule 56(f) supplemental brief. Plaintiff, on October 27, 2005, filed a rebuttal brief to defendant's supplemental response.

## DISCUSSION

Defendant moves for summary judgment, contending there is no genuine issue of material fact to be resolved in this case and seeking a declaration of non-infringement of the patents-in-suit. Defendant contends that, when the patents-in-suit are properly construed, the accused test does not infringe plaintiff's patents, either literally or through the doctrine of equivalents. Plaintiff cross-moves for summary judgment, seeking a judicial declaration that defendant's accused test literally infringes Claim 7 of the '623 patent.

### 1.     Summary Judgment Legal Standard

A moving party who demonstrates that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" may be entitled to summary judgment as a matter of law under Fed. R. Civ. P. 56(c). The nonmoving party can defeat summary judgment by demonstrating that a material issue of fact exists. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when it is outcome determinative. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party. Morgan v. United States, 709 F.2d 580, 584 (9th Cir. 1983). The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury.

1 | Anderson, 477 U.S. at 255.

2 |     A material fact is one that is relevant to an element of a claim or defense and the
3 | existence of which might affect the outcome of the suit.  The materiality of a fact is thus
4 | determined by the substantive law governing the claim or defense.  Disputes over irrelevant or
5 | unnecessary facts will not preclude a grant of summary judgment.  T.W. Electrical Service, Inc.
6 | v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)(citing Anderson, 477
7 | U.S. at 248).

8 |     Entry of summary judgment is appropriate "against a party who fails to make a showing
9 | sufficient to establish the existence of an element essential to that party's case, and on which
10 | that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Without specific
11 | facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient.  See
12 | Schneider v. TRW, Inc., 938 F.2d 986, 990-91 (9th Cir. 1991).

13 |     Cross-motions for summary judgment do not necessarily permit the judge to render
14 | judgment in favor of one side or the other.  Starsky v. Williams, 512 F.2d 109, 112 (9th Cir.
15 | 1975).  The Court must consider each motion separately "on its own merits" to determine
16 | whether any genuine issue of material fact exists.  Fair Housing Council of Riverside County,
17 | Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001); Starsky, 512 F.2d at 112.  When
18 | evaluating cross-motions for summary judgment, the Court must analyze whether the record
19 | demonstrates the existence of genuine issues of material fact, both in cases where both parties
20 | assert that no material factual issues exist, as well as where the parties dispute the facts.  See
21 | Fair Housing Council of Riverside County, 249 F.3d at 1136 (citing Chevron USA, Inc. v.
22 | Cayetano, 224 F.3d 1030, 1037 & n. 5 (9th Cir. 2000)).

23 | 2.    Analysis

24 |     The parties' cross-motions each seek construction of various claim terms contained in
25 | the patents-in-suit, which is required in order for the Court to properly determine the issue of
26 | infringement.  See Liquid Dynamics Corp. v. Vaughan Company, 355 F.3d 1361, 1367 (Fed.
27 | Cir. 2004)(in patent infringement cases, the Court first determines the meaning of the asserted
28 | patent claims, and then compares the properly construed claims to the allegedly infringing

04cv1200

1 device).  Because a determination of infringement requires that claim terms be properly

2 construed, claims construction will be addressed first.

3 **A.    Claims Construction**

4    **1.    Legal Standard**

5    In order to determine the meaning of the asserted patent claims, the court considers "the

6 evidence necessary to resolve disputes about claim terms and to assign a fixed, unambiguous,

7 legally operative meaning to the claim." Liquid Dynamics, 355 F.3d at 1367.  The terms of a

8 claim are given their ordinary and customary meaning, determined from the view of a person

9 of ordinary skill in the relevant art.  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir.

10 2005).  The Phillips court explained:

11    In some cases, the ordinary meaning of claim language as understood by a person
    of skill in the art may be readily apparent even to lay judges, and claim
12    construction in such cases involves little more than the application of the widely
    accepted meaning of commonly understood words.  In such circumstances,
13    general purpose dictionaries may be helpful.  In many cases that give rise to
    litigation, however, determining the ordinary and customary meaning of the claim
14    requires examination of terms that have a particular meaning in a field of art.
    Because the meaning of a claim term as understood by persons of skill in the art
15    is often not immediately apparent, and because patentees frequently use terms
    idiosyncratically, the court looks to 'those sources available to the public that
16    show what a person of skill in the art would have understood disputed claim
    language to mean.' Those sources include 'the words of the claims themselves,
17    the remainder of the specification, the prosecution history, and extrinsic evidence
    concerning relevant scientific principles, the meaning of technical terms, and the
18    state of the art.'

19 Id. at 1314 (internal citations omitted).

20    "The plain and ordinary meaning of claim language controls, unless that meaning renders

21 the claim unclear or is overcome by a special definition that appears in the intrinsic record with

22 reasonable clarity and precision." N. Telecom Ltd. v. Samsung Electronics Co., 215 F.3d 1281,

23 1295 (Fed Cir. 2000).  In some cases, prosecution history can be useful to interpret claim

24 terms, but "it cannot be used to limit the scope of a claim unless the applicant took a position

25 before the PTO that would lead a competitor to believe that the applicant had disavowed

26 coverage of the relevant subject matter." Schwing GmbH v. Putzmeister Aktiengesellschaft,

27 305 F.3d 1318, 1324 (Fed. Cir. 2002).  Absent amendments to the patent claims, an applicant

28 "must clearly and unambiguously express any such surrender of subject matter during

prosecution." Invitrogen Corporation v. Biocrest Manufacturing, 327 F.3d 1364, 1367 (Fed Cir. 2003); see York Products, Inc. v. Central Tractor Farm & Family Center, 99 F.3d 1568, 1575 (Fed. Cir. 1996).

### 2.    Analysis

At issue in these cross-motions are Claim 1 of the '302 patent and Claim 7 of the '623 patent.  Claim 1 of the '302 patent states:

> 1.    A method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising:
> (a)  administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder; and
> (b)  determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder, wherein the level of 6-thioguanine less than about 230 pmol per $8x10^8$ red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and wherein the level of 6-thioguanine greater than about 400 pmol per $8x10^8$ red blood cells indicates a need to decrease the amount of said drug subsequently administered to said subject.

Bush Decl., Exh. G at 87 (emphasis added).

Claim 7 of the '623 patent states:

> 7.    A method of reducing toxicity associated with treatment of an immune-mediated gastrointestinal disorder;
> (a)  administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder;
> (b)  determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder; and
> (c)  determining the level of 6-methyl-mercaptopurine in said subject having said immune-mediated gastrointestinal disorder, wherein the level of 6-thioguanine greater than about 400 pmol per $8x10^8$ red blood cells or the level of 6-methyl-mercaptopurine greater than about 7000 pmol per $8x10^8$ red blood cells indicates a need to decrease the amount of said drug subsequently administered to said subject.

Bush Decl., Exh. A at 21 (emphasis added).  In order to properly rule upon the issues presented in both motions[5] construction of the phrase "greater than about 400" as used in both patent claims is required.  Plaintiff's motion also requires a proper construction of the phrase "indicates a need" as used in the '623 patent.

---

[5] The parties have submitted voluminous briefs containing numerous arguments and evidence in support of their respective motions.  This Court has thoroughly reviewed all arguments and relevant exhibits submitted.  For the sake of brevity, this Order addresses only those arguments and evidence the Court deems relevant in determining the issues presented.

a.    **"Greater Than About 400"**

Defendant's briefs center on construction of the "about 400" term contained in the patents-in-suit, contending that a proper construction of "about 400" would require a finding of non-infringement. *See, e.g.,* Deft's Mot. at 15-19; Reply at 5-6.  Plaintiff, throughout its pleadings, notes that defendant's focus on the "about 400" language improperly ignores[6] the "greater than" language that must be considered in construing the claims at bar. *See, e.g.,* Pltff's Opp. at 15; Pltff's Suppl. Opp. at 15.  This Court, after a thorough review of the patents at issue, finds that construction of both the "greater than" and "about 400" language is clearly required in order to properly construe the claims.

1.    **"Greater Than"**

Plaintiff contends that the "greater than" language "simply means any value larger than about 400 with the understanding that the risk of toxicity increases as the 6-TG[7] level increases." Pltff's Suppl. Opp. at 15.  Although defendant fails to address the "greater than" language in any of its briefs, at oral argument, defendant contends that the "greater than" language cannot be construed as covering all levels higher than "about 400" because there is no upper limit on the level of metabolites and, thus, if the "greater than" language is construed to mean any number higher or more than "about 400," the patents would improperly cover an indefinite number.

Plaintiff explains that no upper limit was required to be disclosed because "[l]evels of 500, 600 or more are still potentially toxic ... [for example] 6-TGN levels of '490' in adults correlate with hematologic toxicity." Pltff's Suppl. Opp. at 14 (citing Bloomfeld Decl., Exh. 1 ('623 Patent) at 32 (Example II).  Plaintiff further explains that there is no reason for an upper limit since "[a]t a certain point, the level of 6-TG will be so high and so toxic that it will cause death (so it is not practically possible to have an infinite amount of 6-TG in a patient)." Pltff's Sur-Rebuttal at 3. Plaintiff admits the patents-in-suit contain no upper limit but argues that

---

[6] As discussed later, defendant did present arguments during the hearing in opposition to plaintiff's proposed construction of the "greater than" language.

[7] For purposes of these motions, 6-TG (6-thioguanine) and 6-TGN (6-thioguanine nucleotides) are used interchangeably. *See* Pltff's Mot. at 3, n.2.

1  "it would be improper to read such a limitation into the claim." Id. (citing Gart v. Logitech,

2  Inc., 254 F.3d 1334, 1343 (Fed.Cir. 2001)).   This Court's review of the patents reveals that

3  plaintiff is correct.   No upper limit is mentioned in the patents-in-suit and, thus, such

4  limitation cannot be considered in construing the terms of the patent claims. See Phillips, 415

5  F.3d at 1312-13.   Therefore, defendant's argument fails.

6      The patents-in-suit do not contain an express definition of "greater than." According to

7  plaintiff, the dictionary definition of "greater than," considered along with the intrinsic

8  evidence supports plaintiff's interpretation of the claims. Pltff's Opp. at 14.   Plaintiff explains

9  that, when the ordinary meaning of "greater than" is applied, the term means "a level of 6-

10 TGN above 'about 400.'" Pltff's Mot. at 16.   Plaintiff notes, in its reply brief, that the

11 inventors used, as an example in the patent specification, a 490 level of 6-TGN found to

12 correlate with hematologic toxicity in adults which "'should be monitored to avoid potential

13 clinical bone marrow suppression.'" Reply at 5 (quoting Bloomfield Decl., Exh. 1 at 32).

14 Plaintiff asserts that the Federal Circuit has found construction of claims that exclude the

15 preferred embodiment is "'rarely, if ever, correct.'" Id. (quoting Interactive Gift Express, Inc.

16 v. Compuserve, Inc., 256 F.3d 1323, 1343 (Fed. Cir. 2001)). Plaintiff explains that "greater

17 than" as used in the patents means "[a]ny level that is above [about 400]" and "[a]ny level

18 which is lower than [about 400] is not a level which is greater than [about 400]." Pltff's Sur-

19 Rebuttal at 2.   Defendant does not dispute plaintiff's construction nor present its own

20 proposed construction of the term.[8]

21      This Court finds that plaintiff's construction of "greater than" defined as "any level that

22 is above about 400" is a proper construction of the term based on its "ordinary and customary

23

24      [8] Plaintiff, however, construes defendant's oral argument as presenting a definition of "greater than"
    which "requires (1) "a comparison of the 6-TG level to 'about 400' and (2) a finding that the 6-TG level is
25  greater than 'about 400.'" Pltff's Sur-Rebuttal at 7. Although plaintiff's construction of defendant's argument
    generously provides defendant with a definition of the term, this Court's does not so construe defendant's
26  arguments, written or oral. This Court does not believe defendant intended to present a definition of "greater
    than" by adding requirements to the term. Even if defendant had so intended, this Court deems it improper to
27  construe a term by adding additional requirements to alter its plain meaning. See Phillips, 415 F.3d
    at 1312-13. Because defendant presents no other possible construction of "greater than," this Court finds
28  defendant does not present its own construction of "greater than" and addresses only plaintiff's proposed
    construction.

1 | meaning, determined from the view of a person of ordinary skill in the relevant art." Phillips,

2 | 415 F.3d at 1312-13. Therefore, this Court construes "greater than" to mean any level that

3 | is above "about 400."

4 |                              2.    "About 400"

5 |        Both parties appear to agree that the patents-in-suit contain no express definition of the

6 | word "about" but differ on whether the Court should consult extrinsic evidence to determine

7 | its meaning. Defendant urges the Court to construe the word "about" without consulting

8 | extrinsic sources. Plaintiff disagrees, contending that, because the word is not expressly defined

9 | in the patent, consulting extrinsic evidence is necessary to properly define the word. The

10 | Phillips court, discussing the use of extrinsic evidence in claims construction, instructs that:

11 |        ... extrinsic evidence may be useful to the court, but is unlikely to result in a
   |        reliable interpretation of patent claim scope unless considered in the context of
12 |        the intrinsic evidence. Nonetheless, because extrinsic evidence can help educate
   |        the court regarding the field of the invention and can help the court determine
13 |        what a person of ordinary skill in the art would understand claim terms to mean,
   |        it is permissible for the district court in its sound discretion to admit and use such
14 |        evidence. In exercising that discretion, and in weighing all the evidence bearing
   |        on claim construction, the court should keep in mind the flaws inherent in each
15 |        type of evidence and assess that evidence accordingly.

16 | Id., 415 F.3d at 1319.

17 |        Based on case authority defining the word "about" in various contexts, defendant

18 | contends that the proper construction of the word "about" requires it be defined narrowly as

19 | "'with some approach to exactness in quantity, number, or time[,]' 'approximately,' [or]

20 | 'reasonably close to.'" Deft's Suppl. Reply at 7(citing Merck & Co. v. Teva Pharm. USA, Inc.,

21 | 395 F.3d 1364, 1369-72 (Fed.Cir. 2005)("about" means "approximately"); Conopco, Inc. v.

22 | May Dep't Stores Co., 46 F.3d 1556, 1561 & n.3 (Fed.Cir. 1994)("the term ['about'] means

23 | ... 'with some approach to exactness in quantity, number, or time,'" adopting Webster's Third

24 | New International Dictionary definition); Cellnet Data Sys. Inc. v. Itron, Inc., 17 F.Supp.2d

25 | 1100, 1114 (N.D.Cal. 1998)("about" means "reasonably close to."); Bush Decl., Exh. W

26 | (Order filed by a Delaware district court, on July 26, 2005, construing "about" in patent as

27 | "approximately")).

28 | //

Plaintiff, on the other hand, points to other cases that indicate the word "about" actually broadens the number, creating a range dependent upon the precision of measurement for the particular technology. Pltff's Suppl. Opp. at 7 (citing <u>Pall Corp. v. Micron Separations, Inc.</u>, 66 F.3d 1211, 127 (Fed. Cir. 1995)("the use of the word 'about,' avoids a strict numerical boundary to the specified parameter."); <u>Modine Mfg. Co. v. U.S. Int'l Trade Commission</u>, 75 F.3d 1545, 1554 (Fed. Cir. 1996)("about" is a "broadening usage[]" which is given a "reasonable scope" and depends on the context and precision of measurement error for the claimed technology)). Plaintiff notes that some courts have actually construed "about" to encompass much broader ranges than the cases cited by defendant. <u>Id</u>. at 7, 8 n.6 (citing, *inter alia*, <u>Hybritech Inc. v. Abbott Labs</u>, 849 F.2d 1446, 1455-56 (Fed. Cir. 1988)(using a two to three fold error in measuring antibodies); <u>Schreiber Foods, Inc. v. Saputo Cheese USA Inc.</u>, 83 F.Supp.2d 942 (N.D. Ill. 2000)(construing "about 2 minutes to about 4 minutes" as encompassing 30 seconds to ten minutes and "about 190 degrees to about 205" as including 150 to 300 degrees)).

Although defendant argues, during oral argument, that no specific range of numbers should be used in defining "about 400," plaintiff contends the proper construction of "about 400" is a range of "400 +/-15-20%," based on extrinsic sources. *See* Pltff's Suppl. Opp. at 8-13. Plaintiff points to various sources of extrinsic evidence, including the Food and Drug Administration ("FDA") guidelines, scientific articles, defendant's documents, expert testimony, and the inventors' testimony, in support of the broader interpretation. *See* <u>id</u>. at 10-13. Plaintiff explains the FDA guidelines are useful in determining what a person of ordinary skill in the art would understand the word "about" means, as used in the patents-in-suit. <u>Id</u>. Plaintiff claims that the Federal Circuit "<u>expressly approved</u>" the use of FDA guidelines in claims construction and the decision in <u>Phillips</u> did not alter that approval. <u>Id</u>. (emphasis in original)(citing <u>Key Pharm. v. Hercon Labs Corp.</u>, 161 F.3d 709, 718 (Fed.Cir. 1998)("it is quite sensible to look to the FDA" guidelines on measurements in order to properly construe a claim term.)). Plaintiff points out the FDA guidelines provide a standard for precision and accuracy in blood testing of +/- 15% or, at the lowest level of detection, 20%. <u>Id</u>. at 4 & n.4.

04cv1200

1  Plaintiff notes that the appropriate variation for the patented test is 15% because the lowest
2  level of detection, considered the most imprecise level warranting a 20% variation, is not
3  applicable here. Id. Thus, plaintiff contends a person of ordinary skill in the art would
4  understand "about 400" to mean "400 +/- 15%." Id. at 4-5.

5  In its rebuttal brief, defendant urges the Court to discount the FDA guidelines'
6  usefulness here[9] because "[t]hey generally establish outer limits for acceptability for the
7  measurement of metabolite levels under a wide variety of circumstances, including
8  measurements in animals" and "say nothing about the actual precision of tests measuring 6-TG
9  or 6-MMP." Deft's Rebuttal at 5-6. Defendant suggests, instead, that the Court look to "the
10 only record evidence regarding the actual precision of tests measuring" these metabolites –
11 defendant's accused test, which lists a precision of 1.5 - 3.8%. Id. at 6. Plaintiff, in response,
12 contends defendant's suggestion to use its own test's precision rate is "absurd" because the
13 accused test was developed well after the patents-in-suit were filed. Pltff's Sur-Rebuttal at 4,
14 n.3. Plaintiff argues that to do so would be clear error. Id. (citing SRI International v.
15 Matsuchita Elec. Corp. of America, 775 F.2d 1107, 1118 (Fed.Cir. 1985)).

16 This Court finds defendant's proposed definitions of "about" to mean "with some
17 approach to exactness in quantity, number, or time," "approximately" and "reasonably close
18 to," although extracted from case authority, are too vague to be useful in the context of the
19 metabolite measurements at issue here. These definitions fail to impart a specific numerical
20 range a person of ordinary skill in the art would understand equates to a metabolite level of
21 "about 400." In fact, defendant admits, during oral argument, that its construction does not
22 delineate a specific numerical range, but contends the Court is not required to do so in order
23 to properly construe the claim term. This Court is unconvinced that a person of ordinary skill
24 in the art would define "about 400" without determining a specific numerical range
25 encompassing the amount. Accordingly, this Court deems it appropriate to resort to extrinsic

26

----

27  [9] Defendant does not appear to dispute that the 2001 guidelines are the applicable guidelines for the
patents-in-suit. This Court notes that the FDA implemented the guidelines in 2001 based on the deliberations
28  of two prior workshops held in 1990 and 2000. *See* Morgan Decl., Exh. 6 at 624. This Court's independent
research reveals no earlier edition of FDA guidelines existed at the time the 2001 guidelines were issued. Thus,
this Court finds the 2001 FDA guidelines are properly applicable to the instant patents.

1  evidence to determine the specific numerical range imparted by the term "about 400" as a

2  person of ordinary skill in the art would understand it.

3      As noted previously, defendant presents no extrinsic evidence to aid in the Court's claims

4  construction.  Plaintiff, on the other hand, presents various sources of extrinsic evidence,

5  including declarations of expert witnesses and the inventors of the patents-in-suit, as well as a

6  variety of documentary evidence.  This Court is mindful that the declarations of expert

7  witnesses and the inventors are, for the most part, to be viewed cautiously because such

8  evidence is "generated at the time of and for the purpose of litigation and thus can suffer from

9  bias."  Phillips, 415 F.3d at 1318.  However, this Court finds that consideration of the

10 declarations submitted by plaintiff are not necessary to properly construe the claim term at

11 issue.  Thus, the declarations of expert witnesses and the patent inventors will not be

12 considered.

13     Plaintiff relies heavily upon the FDA guidelines to support its proposed construction.

14 This Court is unpersuaded by defendant's characterization of the FDA guidelines as unreliable

15 because they establish general guidelines used in a variety of areas and are, therefore, not

16 specific guidelines for measuring the metabolites involved in this suit.  Defendant's suggestion

17 to use the accused test's stated accuracy rate instead is, in this Court's view, inappropriate

18 because the test was developed after the '623 patent was filed and the FDA guidelines were

19 issued.[10]

20     As plaintiff notes, the Federal Circuit agrees the FDA guidelines may be useful in claims

21 construction.  See Key Pharm., 161 F.3d at 718.  This Court finds the FDA guidelines useful

22 here.  This Court deems the FDA guidelines reliable, in that they can be considered in the same

23 genre as dictionaries and treatises since they do not suffer from the bias expert witness

24 testimony presents.  The Phillips court expressly approved the use of dictionaries and technical

25 treatises in claims construction as long as "'the dictionary definition does not contradict any

26 definition found in or ascertained by a reading of the patent documents.'"  Id., 415 F.3d at

27

28     [10] This Court notes that the only evidence presented by defendant of the claimed accuracy rate of its
accused test comes from the deposition testimony of a physician (apparently an expert witness), which is the
type of evidence the Phillips court found to be extremely unreliable.  See Phillips, 415 F.3d at 1318.

1 | 1322-23 (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1584 n.6 (Fed.Cir.
2 | 1996)).

3 |     In that vein, defendant contends that the patent specification contains references to

4 | various other levels mentioned in prior art which were not claimed in the patents-in-suit.[11]

5 | According to defendant, the patent specification of both patents-in-suit state that, in addition

6 | to an "about 400" toxicity level for 6-TGN, levels "'also can be about 350 pmol[12] per $8 \times 10^8$

7 | RBC, 370 pmol per $8 \times 10^8$ RBC, 390 pmol $8 \times 10^8$ RBC, 425 pmol per $8 \times 10^8$ RBC; or 450 $8 \times 10^8$

8 | RBCs.'" Def't's Mot. at 20 (quoting Bush Decl., Exh. A at 12 & Exh. G at 13). Thus, defendant

9 | argues those claimed levels are dedicated to the public[13] and cannot now be claimed by the

10 | patentees. Defendant contends the patent applicants presented arguments to the patent office

11 | indicating the toxicity level described in prior art differed from the patents-in-suit's level recited

12 | in the patents. <u>Id</u>. at 20 (citing Bush Decl., Exh. K at 16, Exh. O at 4, Exh. N at 13).

13 | Defendant argues that "what was different, and new, about their 'invention' was the specific

14 | levels of 6-TGN and 6-MMP recited in their claims." Def't's Reply at 3. Therefore, defendant

---

16 | [11] Defendant also contends plaintiff's proposed construction would render the patents invalid for
17 | indefiniteness because the construction "does not provide the public with adequate notice of what the range of
18 | 'about 400' covers." Def't's Suppl. Reply at 10. Claims are indefinite if they do not "adequately notif[y] the
public of the patentee's right to exclude." <u>Honeywell Intern., Inc. v. I.T.C.</u>, 341 F.3d 1332, 1338 (Fed. Cir.
2003). However, as plaintiff correctly notes, it is improper to consider patent validity in determining claim
19 | construction unless the patent claims are found to be ambiguous, which is not the case here. <u>See</u> Pltff's Reply
at 8-9 (citing <u>Phillips</u>, 415 F.3d at 1327).

20 | [12] The letters "pmol" is an abbreviation for the word picomole, which is a unit of measurement for
metabolites used in medical tests. In the Sanborn patent, levels of 6-TGN and 6-MMP are expressed in terms
21 | of how many picomoles are in every $10^8$ red blood cells while the patents-in-suit levels are expressed in terms
of how many picomoles are in every $8 \times 10^8$ red blood cells. Defendant claims that Dr. Sandborn's use of $10^8$
22 | (or 100,000,000) instead of $8 \times 10^8$ (or 800,000,000) "is clearly a typographical error" in the earlier patent. <u>See</u>
Def't's Mot. at 4-5. However, plaintiff notes that what defendant "believes" is "irrelevant" because Dr.
23 | Sandborn's patent uses $10^8$ red blood cells and no attempts to correct what defendant believes is a mistake
have been made. Pltff's Opp. at 14, n.4. This Court finds it inappropriate to interpret or construct the terms
24 | contained in the Sanborn patent to correct alleged errors because such interpretation is immaterial to the
resolution of the issues here. Thus, this Court declines to resolve the issue.
25 |

26 | [13] Plaintiff disputes defendant's use of the doctrine of dedication to the public in the context of claims
construction because the doctrine has only been applied as a defense to liability for infringement based on the
doctrine of equivalents. <u>See</u> Pltff's Sur-Rebuttal at 13. The argument presented by defendant is that plaintiff
27 | disclosed the claimed levels in the patent specification but did not claim them in the patent, thereby rendering
the disclosed levels available for public use. Defendant's public use argument is similar, but not identical, to
28 | the doctrine of dedication to the public referred to by plaintiff and is, in this Court's view, a valid argument in
determining claims construction.

1  contends that "about 400" cannot encompass any of the levels disclosed in the patent

2  specification because those levels have been dedicated to the public.

3        In response, plaintiff contends that "the phrase 'about 400' denotes the lower limit of

4  a range of 6-TGN values beginning at 400." Pltff's Opp. at 15.  Plaintiff claims that the

5  portions of the specification defendant refers to are actually consistent with plaintiff's

6  construction "because the specification explicitly states that a 'predetermined toxic level' is not

7  an exact number but rather a range." Pltff's Reply at 6.   Thus, according to plaintiff, the

8  ranges mentioned in the specification are different ranges than "about 400" but overlap.  Id.

9  at 9-10.

10        As to defendant's argument that plaintiff disavowed the disclosed levels during

11  prosecution, plaintiff points out that statements made during prosecution will not disclaim the

12  scope of a claim absent a clear and unequivocal disavowal by the applicant, which did not

13  happen here.  Id. at 7 (citing IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1433-

14  34 (Fed. Cir. 2000);  Aquatex Indus., Inc. v. Techniche Solutions, 419 F.3d 1374, 1382-83

15  (Fed. Cir. Aug. 19, 2005)).  Plaintiff observes that the Federal Circuit warned a patent's

16  prosecution history may not be useful in claim construction because "'it represents an ongoing

17  negotiation between the PTO and the applicant, rather than the final product of that

18  negotiation.'" Id. (quoting Phillips, 415 F.3d at 1317). Plaintiff contends that, in this case, no

19  "clear and unequivocal" disavowal of the disclosed levels was expressed during prosecution of

20  the patents and, thus, no disclaimer of that level can now be found.  Id. at 7-8.

21        This Court's review of the record reveals plaintiff did not clearly and unequivocally

22  disavow the disclosed levels in the patents.  Although the patent applicants disclosed various

23  levels during prosecution, the levels were disclosed by stating that the levels "can also be about

24  350 pmol ..." See Bush Decl., Exh. A at 12.  This Court is not persuaded that prefacing

25  disclosures with "can also be" may be considered a clear and unequivocal disavowal of the

26  subject matter.  This Court has found no indication in the intrinsic record that the disclosed

27  levels were clearly and unequivocally disavowed by the patent applicants.  Therefore, the

28  patentee's disclosure and failure to claim the levels does not operate as a disclaimer of the use

1   of those levels. <u>IMS Tech</u>, 206 F.3d at 1433-34; <u>Aquatex</u>, 419 F.3d at 1382-83. This Court

2   thus finds the range of "about 400" may properly encompass the disclosed levels.

3       A careful review of the intrinsic record has discovered no other language that might

4   contradict plaintiff's proposed definition of "about." Therefore, based on the reliable extrinsic

5   evidence provided by plaintiff, this Court finds that the term "about" means "+/- 15%" based

6   on its "ordinary and customary meaning, determined from the view of a person of ordinary skill

7   in the relevant art." <u>Phillips</u>, 415 F.3d at 1312-13. Accordingly, "about 400" is construed as

8   400 +/- 15% encompassing a numerical range of 340 to 460.

9                   **b.    "Indicates a Need"**

10      Plaintiff also contends that the term "indicates a need" as used in the patents-in-suit

11  should be properly construed in order to determine infringement in this case. According to

12  plaintiff, "indicates a need" is "a marker or warning that one should decrease [the] next dose

13  of [the] drug administered" but does not require an actual decrease to occur. Pltff's Mot.

14  at 17-18. Plaintiff claims that the patent specification, the prosecution history and extrinsic

15  evidence supports this ordinary meaning. <u>Id</u>. at 18-21 (citing Bloomfield Decl. ¶¶ 38-47, Exh. 1

16  at 4, 8, 12, Exh. 3 at 284, 298-98, Exhs. 8-11, 20).

17      Defendant, in opposition, points out that plaintiff's proposed construction "reads the

18  word 'need' right out of this phrase and even ignores the very dictionary definition of 'need'

19  [plaintiff] cites in its brief." Opp. at 18. Defendant contends the intrinsic record precludes

20  plaintiff's construction of this phrase. <u>Id</u>. According to defendant, the parties agree that

21  "need" is defined as "a necessary duty or obligation." <u>Id</u>. (citing Morgan Decl., Exh. 16; Pltff's

22  Mot. at 18). Defendant argues "indicates a need" can only mean "indicates a necessary duty

23  or obligation." <u>Id</u>. Thus, defendant asserts the patent claims "require that the metabolite levels

24  'indicate a necessary duty or obligation to decrease the amount of said drug subsequently

25  administered' – i.e., an infringing test must advise doctors to lower the amount of drug if the

26  predetermined toxic level is exceeded." <u>Id</u>. Defendant argues that plaintiff's construction,

27  substituting "should" for "must," flies in the face of the definition of "need" presented in

28  plaintiff's moving papers. <u>Id</u>. Defendant also points to the patent specification and the

1  prosecution history in support of its construction. Id. at 19-20 (citing Bush Decl., Exh. A at 18;

2  Exhs. L at 7, Z at 18, AA at 4).  Defendant claims it is unnecessary to resort to extrinsic

3  evidence to construe the terms. Id. at 22.

4      In reply, plaintiff disagrees with defendant's interpretation of "indicates a need,"

5  claiming defendant's proposed construction requires an actual lowering of the drug dosage if

6  the test shows a metabolite level greater than about 400, when, in fact, the claim does not so

7  state. Pltff's Reply at 10-11.  Plaintiff points out that the inventors used the term "adjusting"

8  in the specification but did not include the same term in the claim, even though they could

9  have done so. Id.

10      Plaintiff contends the results of the patented test are merely one factor to be considered

11  in adjusting dosage; the patented test does not require subsequent doses actually be lowered

12  as defendant argues. Id.  Plaintiff also contends that defendant's construction of "indicates a

13  need" fails to give meaning to the word "indicate" and adds an additional requirement that

14  doses actually be adjusted that is not part of the claim. Id. at 11.  Plaintiff argues that such

15  claim construction is improper. Id. (citing Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,

16  988 F.2d 1165, 1171 (Fed. Cir. 1993)(cautioning that every word in a claim must have

17  meaning); Interactive Gift, 256 F.3d at 1335 (warning that limitations cannot be imported

18  from the specification or prosecution history into the claims); Gart v. Logitech, Inc., 254 F.3d

19  1334, 1343 (Fed. Cir. 2001)(same)).  Finally, plaintiff points out that the specification and

20  prosecution history do not indicate a deviation from the clear language of the claims that

21  defendant's interpretation requires. Id. at 12-13.

22      This Court agrees with plaintiff. In this Court's view, "indicates a need" suggests to the

23  doctor reviewing the test that an adjustment in dosage may be required.  This Court is

24  unpersuaded by defendant's argument that the word "need" signifies the patented test requires

25  doctors to adjust drug dosage if the metabolite level reaches the specified level.  There is

26  nothing in the patent specification or prosecution history that leads this Court to believe that

27  such a requirement should be found.  Because "need" is prefaced by "indicates," this Court

28  finds the phrase means that when the identified metabolites reach the specified level, the doctor

is warned or notified that a dosage adjustment may be required, if the doctor believes that is the proper procedure. Accordingly, this Court, based on the "ordinary and customary meaning, determined from the view of a person of ordinary skill in the relevant art," construes "indicates a need" to mean "a warning that an adjustment in dosage may be required." Phillips, 415 F.3d at 1312-13.

### 3.    Conclusion

Based on the foregoing, this Court construes the following terms contained in the patents-in-suit:

1.    "Greater than about 400" is construed to mean "any level above 340 to 460;" and

2.    "Indicates a need" is construed to mean "a warning that an adjustment in dosage may be required."

### B.    Infringement

#### 1.    Legal Standard

Once the claim terms are properly construed by the court, the properly construed claims "must be compared to the accused device or process." C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 861 (Fed. Cir 2004). To infringe a patent, a patentee must prove the accused device meets each claim limitation, either literally or under the doctrine of equivalents.[14] Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1367 (Fed. Cir. 2004).

#### 2.    Analysis

Defendant, in its summary judgment motion, seeks a declaration of non-infringement. Contrarily, plaintiff, in its cross-motion for summary judgment, contends that the accused test literally infringes claim 7 of the '623 patent. To establish literal infringement of a patent "every limitation [or element] set forth in a claim must be found in an accused product or process."

---

[14] Defendant presents various arguments, in its moving papers, concerning infringement based on the doctrine of equivalents, contending that the doctrine does not apply in this case. See Deft's Mot. at 23-25. In opposition to defendant's motion, plaintiff argues that the doctrine of equivalents does apply. See Pltff's Opp. at 19. However, plaintiff's cross-motion for summary judgment, seeking a declaration of infringement, is based solely on literal infringement of Claim 7 of the '623 patent. See Pltff's Reply at 10. Accordingly, this Court addresses the parties' arguments concerning literal infringement only and does not address arguments concerning the doctrine of equivalents, including defendant's arguments regarding the doctrine of dedication to the public or prosecution history estoppel.

1   Johnston v. IVAC Corp., 885 F.2d 1574, 1577 (Fed. Cir. 1989). "There can be no

2   infringement as a matter of law if a claim limitation is totally missing from the accused device."

3   London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1538-39 (Fed. Cir. 1991).

4   Defendant describes its accused test as follows:

5   the accused test measures levels of 6-TGN and 6-MMP in a patient's blood, and
    reports these results to a treating physician. With these results, the test includes
6   the following information:

7   [L]evels of 6-TGN ... greater than 450 pmol/$8 \times 10^8$ cells may be
    associated with increased risk of myelosuppression, liver injury,
8   pancreatitis, and allergic reactions.

9   . . .

10  6-MMP levels of >5700 pmol/$8 \times 10^8$ RBC have been reported to be
    associated with an increased frequency of abnormal liver function
11  tests.

12  Deft's Mot. at 5 (quoting Bush Decl., Exh. E at 2). Thus, the accused test informs physicians

13  that, when metabolite levels reach 450 and above, possible complications may occur. However,

14  the test states that "a clearly defined toxic level has not been established." Bush Decl., Exh. E

15  at 2.

16  Plaintiff argues that defendant's proposed test, announced in its implementation notice

17  dated June 9, 2004 (thus constituting an offer for sale[15]), literally infringes plaintiff's patents

18  because the accused test:

19  meets every limitation of the method of claim 7: (1) the administration of a drug
    providing 6-thioguanine to a subject having said immune-mediated
20  gastrointestinal disorder; (2) determining the level of 6-thioguanine in said subject
    and determining the level of 6-methyl-mercaptopurine in said subject; and (3)
21  wherein the level of 6-thioguanine greater than about 400 pmol $8 \times 10^8$ red blood
    cells indicates a need to decrease the amount of said drug subsequently
22  administered to said subject.

23  Pltff's Mot. at 23 (citing Bloomfield Decl. ¶¶ 48-54). Plaintiff claims that defendant's accused

24

25  [15] The parties do not appear to dispute that defendant's announcement constitutes an offer for sale.
    An offer for sale of a patented invention by one who is not the patent owner or licensee may constitute
26  infringement. See 35 U.S.C. § 271(a). Defendant argues that, because the claims in the patents-in-suit are
    method claims, the claims may only be infringed if the method is actually performed. Deft's Opp. at 24 (citing
27  Joy Technologies v. Flakt, Inc., 6 F.3d 770, 773 (Fed. Cir. 1993)). Defendant notes that it has only offered its
    test for sale and, thus, has not actually performed the test. Id. at 24-25. However, plaintiff, in reply, correctly
28  points out that the statute governing patent infringement (amended after the Joy case, which does not involve
    an offer for sale) clearly states that an offer for sale creates liability for infringement. Pltff's Reply at 14, 22
    (citing 35 U.S.C. § 271(a)). Therefore, defendant's argument fails.

test clearly meets the first two limitations. *See* id. at 23-24. As to the third limitation, plaintiff contends that the accused test infringes when the claim terms are properly construed as previously argued. Id. at 24-25.

Defendant contends, in opposition, that the accused test, if used, would not infringe the patents-in-suit for two reasons: (a) the test would not use either claimed level of "about 400" or "about 7000;"[16] and (b) the test would not "indicate a need to decrease the amount of said drug subsequently administered" to a patient. Id.

### a.    Use of "about 400"

Defendant argues, in opposition, that a proper construction of the claim terms "greater than" and "about 400" using defendant's proposed construction would render defendant's accused test not infringing plaintiff's patents. Deft's Opp. at 22. However, this Court has now adopted plaintiff's construction of the claim term "greater than," construing the term to mean "any level above" the specified level. The accused test uses a metabolite level of 450 which is clearly above the "about 400" level. This Court has also adopted plaintiff's construction of "about 400," construing the term to mean "400 +/- 15% or a range of 340 to 460." The accused test's level falls within that range also. Thus, the accused test literally infringes the "greater than about 400" element of the patented test.

### b.    "Indicates a Need"

Defendant also contends that a proper construction of "indicates a need" would obviate any infringement because its accused test as described in the implementation notice does not inform the physician that the dosage should be changed. Deft's Opp. at 23. Instead, defendant argues that the notice informs physicians of "possible myelosuppression" which indicates the physician should consider the possibility that there is toxicity without providing a possible

---

[16] Defendant points out that plaintiff has failed to present evidence proving the accused test uses the level of "about 7000." Deft's Opp. at 22. Defendant contends that Claim 7 of the '623 patent requires that both levels be used "as a 'double-check' against toxicity," and defendant's accused test uses neither. *See* Deft's Rebuttal at 4-5. Plaintiff, in response, explains that Claim 7 provides for "alternative levels that serve as an indication of a need to decrease doses." Pltff's Sur-Rebuttal at 1(emphasis omitted). This Court's review of the patent language reveals that plaintiff's interpretation is correct. Although both levels may be measured to determined whether dosage adjustment is needed, the physician is notified if either level exceeds the predetermined toxic level. Accordingly, defendant's argument that both levels must be used by the accused test in order to find infringement is without merit.

1  action to take. Id. (citing Bush Decl., Exh. S at 57, 61). In addition, defendant explains that

2  the accused test would include cautionary language informing doctors to "monitor white cell

3  count to detect myelotoxicity ... and ... TGN concentrations" and stating "that there is no

4  defined toxic level established." Id. at 24 (quoting Bush Decl., Exh. S at 147; citing Bush Decl.,

5  Exh. CC). Thus, defendant contends that the 6-TGN levels are merely one factor doctors

6  consider in treatment based on defendant's accused test's results, which does not meet the

7  "indicates a need" prong in plaintiff's patents. Id.

8      This Court has now construed "indicates a need" to mean "a warning that an adjustment

9  in dosage may be required." Defendant's explanation of the accused test's procedure appears

10  almost identical to this Court's view of the patented test's procedure. The accused test, used

11  for patients taking AZA drugs, informs physicians that metabolites measuring above the levels

12  stated have been known to cause certain effects, which information the doctors may use to

13  determine further treatment. The patented test warns physicians that, when metabolite levels

14  reach above a certain point, an adjustment in dosage may be warranted. This Court notes that

15  both tests are used in measuring the metabolite level in patients taking AZA drugs and inform

16  physicians that the higher metabolite level raises the risk of toxic side effects. Defendant's test

17  may not actually state that drug dosage should be reduced, but the fact that the accused test

18  measures the metabolite level of patients taking AZA drugs implies that, when the risk of toxic

19  side effects are raised, drug dosage adjustment may be one of the proper courses of action to

20  avoid toxic side effects of the drugs. That is exactly what plaintiff's patented test warns.

21  Therefore, this Court finds defendant's accused test literally infringes the "indicates a need"

22  element of the patented test.

23          3.     Conclusion

24      Based on the Court's construction of the claim terms at issue, and for the reasons

25  presented, this Court finds that there is no genuine issue of material fact to be resolved as to

26  whether defendant's accused test literally infringes plaintiff's patents. This Court finds

27  defendant's accused test literally infringes all elements of the patents-in-suit. Because this

28  Court has ruled in plaintiff's favor on the issue of infringement, plaintiff's Rule 56(f) motion

1  for further discovery on that issue is moot.

2  **CONCLUSION AND ORDER**

3      Based on the foregoing, IT IS HEREBY ORDERED that:

4      1.    Defendant's motion for summary judgment is **DENIED**; and

5      2.    Plaintiff's cross-motion for summary judgment is **GRANTED**.

6      IT IS FURTHER ORDERED that defendant's motion to strike plaintiff's objections to

7  defendant's facts and evidence [doc. # 73] and plaintiff's request for further discovery pursuant

8  to Fed.R.Civ.P. 56(f) are **DENIED as moot**.

9

10  Dated:     November 21, 2005

11

12                                       JOHN A. HOUSTON
                                     United States District Judge

13  cc: Magistrate Judge Brooks
     All Counsel of Record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28