1   F. T. Alexandra Mahaney (SBN 125,984)
    Natalie J. Morgan (SBN 211,143)
2   Michael J. Hostetler (SBN 216,656)
    WILSON SONSINI GOODRICH & ROSATI
3   12235 El Camino Real, Ste. 200
    San Diego, California 92130
4   Telephone: (858) 350-2300
    Facsimile: (858) 350-2399
5

6   Attorneys for Plaintiff Prometheus Laboratories Inc.

7

8                        UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10  PROMETHEUS LABORATORIES, INC.,          )   CASE NO.: 04-CV-1200 JAH (RBB)
                                            )
11           Plaintiff,                      )   **PROMETHEUS LABORATORIES,**
                                            )   **INC.'S OPPOSITION TO**
12       v.                                  )   **DEFENDANTS' MOTION FOR**
                                            )   **SUMMARY JUDGMENT OF**
13  MAYO COLLABORATIVE SERVICES dba          )   **PATENT INVALIDITY UNDER**
    MAYO MEDICAL LABORATORIES and            )   **35 U.S.C. § 101**
14  MAYO CLINIC ROCHESTER,                   )
                                            )
15           Defendant.                      )
                                            )
16  MAYO COLLABORATIVE SERVICES dba          )
    MAYO MEDICAL LABORATORIES and            )   DATE:    March 29, 2007
17  MAYO CLINIC ROCHESTER,                   )   TIME:    3:00 p.m.
                                            )   JUDGE:   Hon. John A. Houston
18           Counter-Claimant,               )   CTRM:    11
                                            )
19       v.                                  )
                                            )
20  PROMETHEUS LABORATORIES, INC.,           )
                                            )
21           Counter-Defendant.              )
                                            )
22  _____ )

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................1

II.     LEGAL FRAMEWORK FOR 35 U.S.C. §101 ...............................................4

        A.      The Standard - Everything Made By Man Is Patentable............................4

        B.      The Claims Must Be Examined As A Whole And Cannot Be Dissected Into "Old" And "New" Elements ......................................................6

        C.      The Claims Of The Patents-In-Suit Are Presumed To Be Valid And The PTO Is Presumed To Have Done Its Job In Allowing The Patents To Issue..........7

        D.      The Standard For Summary Judgment.......................................................7

III.    DEFENDANTS' MOTION SHOULD BE DENIED WITH PREJUDICE.......................8

        A.      Defendants Ask This Court To Make New Law – This Invitation Should Be Rejected...............................................8

        B.      The Claims At Issue Do Not Involve A "Natural Phenomenon"...............9

                1.      The Proper Question Is Whether The Thing Alleged To Be A "Natural Phenomenon" Is Naturally Occurring Or Non-Naturally Occurring.............................................9

                2.      The Correlations Here Are Not "Natural Phenomena" .............................10

                3.      The Fact that the Correlations Are Not "Natural Phenomena" Is Dispositive and Requires the Denial of Defendants' Motion ..................12

        C.      Alternatively, If The Correlations Are "Natural Phenomena," The Claims Do Not "Recite" The Correlations ..........................................13

        D.      Alternatively, If The Claims At Issue "Recite" A "Natural Phenomena," The Claims Are Patentable...........................................14

                1.      Mayo Fails To Consider The Claims As A Whole And Improperly Dissects The Claims ..............................................14

                2.      The Claimed Methods Transform An Article Into A Different State .......16

                3.      Alternatively, The Claimed Methods Produce A Useful, Concrete and Tangible Result....................................................18

        E.      Even If The Claims At Issue Involve "Natural Phenomena," The Claims At Issue Do Not "Wholly Preempt" Public Use Of Such "Phenomena" ..................19

        F.      Prometheus Is Entitled To Foreclose Defendants And Their Doctors From Using The Patented Treatment Methods.........................................22

        G.      A Finding That The Claims At Issue Are Invalid Under 35 U.S.C. §101 Could Have Wide-Spread Adverse Implications For Thousands Of Patents........23

H.   *Lab. Corp. v. Metabolite Labs.* Is Not Law And Should Not Be Considered By This Court In Any Manner ..........................................................24

I.   Even If The Court Considers *Lab. Corp.* It Does Not Change The Conclusion That Defendants' Motion Should Be Denied.......................25

IV.   THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE GRANTING DEFENDANTS' MOTION ..........................................27

V.   CONCLUSION ...........................................................................................27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AT&T v. Excel Comm., Inc.*, 172 F.3d 1352 (Fed. Cir. 1999)...................................5, 13, 18, 21, 26

*Applied Materials Inc. v. Advanced Semiconductor Materials*, 98 F.3d 1563 (Fed. Cir. 1996) ...................................................................................................................7

Arrhythmia Research Tech., Inc. v. Corazonix Corp., 958 F.2d 1053 (Fed. Cir. 1992).........................................................................................................................Passim

*Celotex Corp. v. Catrett*, 477 U. S. 317 (1986)........................................................................7

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ........................................................9, 10, 13

*Diamond v. Diehr*, 450 U.S. 175 (1981) ........................................................................Passim

*Fiers v. Revel*, 984 F.2d 1164 (Fed. Cir. 1993) ....................................................................11

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127 (1948)........................................10

*Gottschalk v. Benson*, 409 U.S. 63 (1972) ................................................................4, 20, 21

*In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994)..........................................5, 13, 18,20, 21, 26

*In re Bell*, 991 F.2d 781 (Fed. Cir. 1993)..............................................................................11

*In re Chupp*, 816 F.2d 643 (Fed. Cir. 1987)..........................................................................11

*In re Grams*, 888 F.2d 835, 839 (Fed. Cir. 1989)............................................................15, 16

*In re Halleck*, 422 F.2d 911 (C.C.P.A. 1970) .......................................................................11

*In re Musgrave*, 431 F.2d 882 (CCPA 1970) .........................................................................18

*In re Pardo*, 684 F.2d 912 (C.C.P.A. 1982) ..........................................................................13

Lab. Corp. of Am. Holdings v. Metabolite Labs. Inc., 126 S.Ct. 2921 (2006).....................Passim

*Le Roy v. Tatham*, 55 U.S. (14 How.) 156 (1852) .................................................................10

*Merck & Co. v. Teva Pharm., Inc.*, 347 F.3d 1367 (Fed. Cir. 2003) ..........................................11

*Minnesota Mining and Mfg. Co. v. Chemque Inc.*, 303 F.3d 1294 (Fed. Cir. 2002) .....................7

*O-Reilly v. Morse*, 56 U.S. (15 How.) 62 (1853) ..................................................................10

*Parker v. Flook*, 437 U.S. 584 (1978)........................................................................4, 20, 21

*South Corp. v. U.S.*, 690 F.2d 1368 (Fed. Cir. 1982)...........................................................18

*State Street Bank and Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998) .................................................................................... 5, 18, 26

*Superior Fireplace Co. v. Majestic Prod. Co.*, 270 F.3d 1358 (Fed. Cir. 2001) ........................... 7

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) .................................................. 8

## STATUTES

35 U.S.C. §101 ...............................................................................................Passim

35 U.S.C. §102 ........................................................................................................ 6

35 U.S.C. §103 ........................................................................................................ 7

35 U.S.C. §282 ........................................................................................................ 7

35 U.S.C. §287 ...................................................................................................... 22

## RULES

Fed. R. Civ. P. 56(c) ............................................................................................... 7

## MISCELLANEOUS

H.R. Rep. No. 104-863 (1996) .............................................................................. 22

1

## I.   INTRODUCTION

2      Congress intended that patentable subject matter under 35 U.S.C. §101 include "anything

3  under the sun that is made by man."  The claims at issue of the patents-in-suit clearly fall within

4  this broad directive as they cover a method for treatment using a man-made drug.  While courts

5  have articulated the general vague principle that laws of nature, natural phenomena and abstract

6  ideas are not patentable, no court has ever held that any method for treatment or diagnosis, let

7  alone a method using a man-made drug, is not patentable subject matter under §101.  Rather, the

8  patentability of such claims is evidenced by the thousands of patents directed to methods of

9  treatment and diagnosis issued to the pharmaceutical and biotechnology industry, including patents

10  issued to the Defendants in this case.  *(See examples of such patents attached as Appendix A and*

11  *B)*.  Indeed, Defendants' own patents contradict their arguments.

12      The claims at issue are patentable subject matter under §101 because the correlations[1]

13  determined by the inventors are not "natural phenomena."  The metabolites described in the

14  claims-at-issue do not naturally exist in the body; rather, they are created by the body as the result

15  of the administration of a man-made drug.  In other words, the correlations determined by the

16  inventors are not a naturally-existing condition, but rather are the results of man's manipulation.

17  The Supreme Court has confirmed that nonnaturally occurring things are not "natural phenomena."

18  And all cases which have found a natural phenomena have one thing in common – the claims

19  involved things that exist naturally without man's actions or manipulation.  Given that the claims

20  at issue in this case do not involve any "natural phenomena," no further inquiry is needed.

21  _____

22      [1] To be clear, while the claims-at-issue are based on these correlations, they are not directed to
these correlations.  The inventors of the patents-in-suit invented methods for treating patients with
23  specific diseases taking certain man-made drugs; and the claims are directed to such treatment
methods.  Prometheus addresses the correlations because they are the focus of Defendants' motion.
24  Furthermore, Prometheus uses the word "correlations" to refer specifically to the three
relationships determined by the inventors: 1) that 6-TGN metabolite levels above about 230 pmol
25  per $8 \times 10^8$ red blood cells are associated with therapeutic efficacy; 2) that 6-TGN metabolite levels
above about 400 pmol per $8 \times 10^8$ red blood cells are associated with toxicity; and 3) that 6-MMP
26  metabolite levels above about 7000 pmol per $8 \times 10^8$ red blood cells are associated with toxicity.
These three relationships were determined based on the inventors' knowledge, experience and
27  statistical analysis of patient data.  While these specific levels are generally applicable to a patient
population, these levels are not an "absolute sign" of efficacy/toxicity for every patient.  *[See infra*
28  *at Section III.B.2]*.  Thus, the correlations here are different from those found in other contexts
where the correlation is an absolute (*i.e.*, 1:1) association.

1   Defendants' motion should be denied with prejudice on this ground alone.

2       Alternatively, even if the correlations determined by the inventors are viewed as natural

3   phenomena, the claims at issue are still patentable under §101 because the claims do not "<u>recite</u>"

4   the alleged natural phenomena.  If and only if a claim actually recites a natural phenomenon, then a

5   further inquiry is needed into whether the claim covers patentable subject matter.  However, if the

6   claims do not recite the alleged natural phenomenon, no further inquiry is required.  Here, the

7   claims at issue do not recite the inventors' correlations, but claim treatment methods consisting of:

8       a) administering a man-made drug;
        b) determining metabolite levels created by the administration of the drug; and

9       c) providing a warning that when metabolite levels are less than about 230 pmol/8x$10^8$ red
        blood cells, greater than about 400 pmol/8x$10^8$ red blood cells (or greater than about 7000

10      pmol/8x$10^8$ red blood cells in some claims) subsequent doses may need to be adjusted.

11  Thus, Defendants' motion should be denied with prejudice on this ground alone.

12      Alternatively, even if the claims at issue are viewed as reciting a natural phenomenon, they

13  are still patentable subject matter under §101.  The Supreme Court holds that the mere presence of

14  a natural phenomenon in a claim does not render the claim unpatentable.  Rather, such a claim is

15  patentable as long as the claim, taken as a whole and considering all elements, both new and old,

16  (1) results in a physical transformation for which a practical application is known, <u>or</u> (2) produces

17  a useful, tangible and concrete result.  The claims at issue clearly meet both of the two alternatives.

18  First, the claims require several transformations.  The man-made drug is transformed into

19  metabolites in the body of the patient.  The blood sample of the patient is chemically altered to

20  obtain a raw number representing the concentration of metabolites in the blood.  Then, the raw

21  number is transformed into a warning based on specific levels that subsequent doses may need to

22  be adjusted.  Second, the claims at issue produce a useful, tangible and concrete result in at least

23  two ways.  The warning provides the treating physician with the levels of metabolites in the blood

24  of the patient being tested and an indication of what to do with those levels.  The claimed treatment

25  methods also result in better patient care.  Both results are useful, tangible and concrete.

26      Defendants ignore precedential law which requires this Court to apply the alternative

27  transformation/results tests.  Instead, Defendants argue that the claims at issue are invalid because

28  the claims allegedly "preempt" (*i.e.*, preclude) some other people from using the inventors'

1   correlations.  This argument is legally and factually incorrect.  The proper inquiry after applying

2   the alternative transformation/result test is whether the claims "wholly preempt" all uses of the

3   alleged natural phenomenon.  Clear Supreme Court law holds that it is entirely permissible for a

4   claim to foreclose some uses of a natural phenomenon so long as not all uses are foreclosed by the

5   claim.  Here, the claims at issue do not foreclose many other substantial uses of the correlations,

6   such as, as just one example, research not involving patient treatment.  Moreover, no Supreme

7   Court and Federal Circuit case has ever found that a claim which meets either of the alternative

8   transformation/results tests is invalid because it "wholly preempts" all other uses.  This makes

9   sense because a claim that meets either the transformation or results test is only  foreclosing the

10   particular application claimed, and not all other uses of the underlying natural phenomenon.

11       Lastly, Defendants' heavy reliance on the dissenting opinion in the *Lab. Corp.* case is

12   misplaced.  First, Defendants are improperly relying on a three justice **dissent** to a dismissal of a

13   writ of certiorari.  This dissent is not law, is not precedent, and is not even an indication of what

14   the majority of the Supreme Court might do if faced with the issue on the merits.  Second, the

15   claims at issue in *Lab. Corp.* are so different from the claims at issue here that the *dissent's*

16   rationale provides no guidance for this case.  In contrast to this case, there was no question that the

17   *Lab Corp.* claims (1) directly recited a correlation step and (2) that the correlation was not the

18   result of a man-made drug, but rather was a natural phenomenon involving the relationship

19   between naturally occurring amino acids in the body and a vitamin deficiency.  Furthermore, the

20   claims in this case include key limitations not found in the *Lab. Corp.* claims, including limitations

21   to specific diseases and specific man-made drugs, limitations to determining metabolite levels in

22   red blood cell units, and a requirement that the warning be based on specific levels. Because of

23   these differences, the *Lab. Corp.* dissent provides no guidance for this case.

24       In summary, Defendants' motion for summary judgment should be denied with prejudice,

25   or at a minimum, denied on the ground that there are triable issues of fact which preclude granting

26   summary judgment.  Under applicable Supreme Court and Federal Circuit law, the claims at issue

27   are clearly patentable.  Prometheus respectfully submits that it is not the District Court's place to

28   make new law especially when, the new law proposed by Defendants could negatively impact

1  thousands of issued patents.  As the Supreme Court has cautioned, "courts should not read into the

2  patent laws limitations and conditions which the legislature has not expressed."[2]

## II.    LEGAL FRAMEWORK FOR 35 U.S.C. §101

### A.    The Standard - Everything Made By Man Is Patentable

5       Article 1, Section 8, clause 8 of the U.S. Constitution directs Congress to promote progress

6  of useful arts by conferring exclusivity to an invention for a limited time to the inventors.

7  Congress defined by statute what is patentable subject matter as including "any new and useful

8  process" or improvement thereof.  35 U.S.C. §101.  Congress intended statutory patentable subject

9  matter to "include anything under the sun that is made by man."  *Diamond v. Diehr*, 450 U.S. 175,

10  182 (1981).  And the Supreme Court has "more than once cautioned that 'courts should not read

11  into the patent laws limitations and conditions which the legislature has not expressed.'"  *Id.*

12       In 1981, the Supreme Court decided the *Diehr* case.  In fact, not only is *Diehr* the last time

13  the Supreme Court interpreted §101, *Diehr* superseded prior Supreme Court interpretations of

14  §101 to the extent they are inconsistent with *Diehr*.  *See Arrhythmia Research Tech., Inc. v.*

15  *Corazonix Corp.*, 958 F.2d 1053, 1057, n.4 (Fed. Cir. 1992) ("it appears to be generally agreed that

16  . . . the reasoning in *Diehr* not only elaborated on, but in part superseded, that of *Benson* and

17  *Flook*").  Thus, *Diehr* and cases applying *Diehr* cases set forth the standard for §101.

18       In *Diehr*, the Court acknowledged that there are very few exceptions to patentable subject

19  matter.  These exceptions are "laws of nature, natural phenomena, and abstract ideas."  *Diehr*, 450

20  U.S. at 185.  Thus, the first threshold question in a §101 analysis is whether there is a law of

21  nature, natural phenomenon, or abstract idea being utilized.  If not, the inquiry ends.  However,

22  even if an invention utilizes a law of nature, etc., "a process is not unpatentable simply because it

23  contains a law of nature."  *Id.* at 187 (citations omitted).  The second question is whether the claim

24  "recites" the scientific principle or natural phenomenon.  *Id.* at 192.  If not, the inquiry ends here.

---

26  [2] The relief Defendants seek is that the patents-in-suit be held invalid.  Yet, in section II.B. of
their motion, Defendants identify the claims at issue in their motion as only Claims 1, 5-7, 13-14,

27  22, 24, 25, 30, 32, 33, 35, 36, 46, 52 and 53 of the '623 Patent and Claim 1 of the '302 patent.
Thus, the other claims of the patents are not at issue nor could they be because these claims contain

28  limitations Defendants have not addressed.  For example, Claims 7 and 24 of the '302 Patent
require that if subsequent doses are decreased, "said decrease reduces toxicity." *[Exh. 2].*

If so, then the third question concerns whether the claim is seeking patent protection for the phenomenon in the abstract, or whether the claim implements a natural phenomenon "in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect," thus satisfying §101. *Id.* This is because the application of a law of nature, etc. to a known structure or process can be patentable if applied to a particular application:

> It is now commonplace that an ***application*** **of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection**.

*Id.* at 197 (italics in original). A process employing a natural phenomenon "is performing a function which the patent laws were designed to protect" if it <u>either</u>:

> a) Transforms an article or physical object to a different state or thing; <u>**or**</u>
> b) Produces a "useful, concrete and tangible result."

*AT&T v. Excel Comm., Inc.*, 172 F.3d 1352, 1357-1358 (Fed. Cir. 1999); *see also Diehr*, 450 U.S. at 184, 188; *In re Alappat*, 33 F.3d 1526, 1544 (Fed. Cir. 1994); *State Street Bank and Trust Co. v. Signature Financial Group. Inc.*, 149 F.3d 1368, 1373 (Fed. Cir. 1998). A physical transformation is not an "invariable requirement, but merely one example" of how use of a law of nature, etc. may be patentable. *AT&T*, 172 F.3d at 1358-59. The other recognized way to meet §101 is by showing that the result is "useful, concrete and tangible." *Id.* The United States Patent and Trademark Office ("PTO") guidelines for examination of patent applications for subject matter eligibility confirm this alternative two-part test. *[Exh. 9 at 2100-11].*

Some cases have also looked at whether the claimed invention "wholly preempts" <u>all uses</u> of the natural phenomenon or abstract idea. *See Diehr*, 450 U.S. at 187; *Arrhythmia*, 958 F.2d at 1059-1060; *AT&T*, 172 F.3d at 1357-57; *Alappat*, 33 F.3d at 1544; *see also* PTO Guidelines *[Exh. 9 at 2100-13]*. However, in all cases where the Supreme Court or Federal Circuit has upheld a claim and found that the claimed invention at issue either 1) transforms an article, or 2) produces a useful, etc. result, the courts have <u>also</u> found that the claims do not "wholly preempt" all uses of the natural phenomenon or abstract idea. *Diehr*, 450 U.S. at 187; *Arrhythmia*, 958 F.2d at 1059-1060; *AT&T*, 172 F.3d at 1357-57; *Alappat*, 33 F.3d at 1544. This is entirely consistent because a claim that transforms matter or produces a useful result would only be foreclosing others from using the natural phenomenon or abstract idea for the particular applications found in the claims,

and not all other uses thereof. This was precisely the case in *Diehr*: "they seek only to foreclose from others the use of the equation in conjunction with all of the other steps in their claimed process." *Diehr*, 450 U.S. at 187. It is entirely proper to foreclose use of a natural phenomenon in conjunction with all of the claimed steps in a method if that method either 1) transforms an article, or 2) produces a useful, concrete, tangible result.

**B.   The Claims Must Be Examined As A Whole And Cannot Be Dissected Into "Old" And "New" Elements**

In determining an invention's eligibility for patent protection under §101, the claim must be examined "<u>as a whole.</u>" *Diehr*, 450 U.S. at 188. Thus, each and every step of the claimed methods must be considered to determine whether the claim as a whole is for a particular application of a "natural phenomenon" (which is patentable) or for the "natural phenomenon" itself.

In addition, the Supreme Court has specifically cautioned against dissecting the claims into new and old elements as Defendants do:

> **It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis.** This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.

*Id.* at 188 (emphasis added). In fact, the Court rejected the petitioner's argument that the claim was not patentable because everything other than the algorithm was "old in the art." *Id.* at 189, n.12. "To accept the analysis proffered by petitioner would, if carried to its extreme, make all inventions unpatentable." *Id.* Thus, the claims at issue cannot be dissected as Defendants do. Each claim as a whole, including all recited elements whether "old" or not, must be considered.

Moreover, the Supreme Court confirmed that "novelty" is not an appropriate consideration:

> The **"novelty"** of any element or steps in a process, or even of the process itself, **is of no relevance** in determining whether the subject matter of a claim falls within the §101 categories of possibly patentable subject matter.

*Id.* at 188-89 (emphasis added). The "novelty" requirement is set forth in 35 U.S.C. §102 and is a separate consideration from whether the invention is patentable subject matter under §101. *Id.* at 189-191. It is improper to "read out" steps that are allegedly not "novel":

> **The fact that one or more of the steps in respondents' process may not, in isolation, be novel or independently eligible for patent protection is irrelevant** to the question of whether the claims as a whole recite subject matter *eligible* for patent protection under §101. . . . In order for the dissent to reach its

1   conclusion it is necessary for it to read out of respondents' patent application all
    the steps in the claimed process which it determined were not novel or
2   "inventive." **That is not the purpose of the §101 inquiry and conflicts with**
    **the proposition recited above that a claimed invention may be entitled to**
3   **patent protection even though some or all of its elements are not "novel."**

4   *Id.* at 193, n.15 (bold emphasis added).  Similarly, whether the invention satisfies the conditions

5   for nonobviousness under 35 U.S.C. §103 is a separate consideration.  *Id.* at 191.  Thus, whether

6   the claims at issue recite "novel" elements is irrelevant to Defendants' motion.

7   **C.     The Claims Of The Patents-In-Suit Are Presumed To Be Valid And The PTO Is**
        **Presumed To Have Done Its Job In Allowing The Patents To Issue**

8           It is a well established principle that issued patents are presumed valid.  35 U.S.C. §282

9   This is based on the presumption that the PTO, the agency charged with examining patents, has

10  done its job properly.  *Applied Materials Inc. v. Advanced Semiconductor Materials*, 98 F.3d 1563,

11  1569 (Fed. Cir. 1996); *Superior Fireplace Co. v. Majestic Prod. Co.*, 270 F.3d 1358, 1367, n.1

12  (Fed. Cir. 2001).  Thus, "[w]hen a patent has been examined and duly granted, judicial review

13  must give due weight to the presumption of validity."  *Applied Materials*, 98 F.3d at 1569.

14          In performing their jobs at the PTO, patent examiners are required to consider whether an

15  invention meets the requirements of §101.  *[Exh. 10]*.  Thus, the examiner of the patents-in-suit is

16  presumed to have done his job properly.

17  **D.     The Standard For Summary Judgment**

18          Summary judgment is proper if "there is no genuine issue as to any material fact and that

19  the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp.*

20  *v. Catrett*, 477 U. S. 317, 322 (1986).  While the issue of whether a claim is directed to statutory

21  subject matter is a question of law, the "determination of this question may require findings of

22  underlying facts specific to the particular subject matter and its mode of claiming."  *Arrhythmia*,

23  958 F.2d at 1056.  Defendants, who are challenging the validity of certain claims of the patents-in-

24  suit, bear the burden to show that the claims at issue are invalid by clear and convincing evidence.

25  *Minnesota Mining and Mfg. Co. v. Chemque Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).  Thus,

26  Defendants must show by clear and convincing evidence that the claims at issue a) employ a

27  "natural phenomenon," b) do not transform an article to a different state, and c) do not produce a

28  "useful, concrete and tangible result."  In addition, Defendants must also show by clear and

1  convincing evidence that the claims at issue preempt <u>all uses</u> of the alleged natural phenomenon.

2  If Defendants do not carry their burden (and they have not), then, as a matter of law, Defendants'

3  motion must be denied.  Further, Defendants must show that there are no genuine issues of

4  material fact as to any of these issues.  Because Prometheus is the non-moving party, the evidence

5  must be viewed in a light most favorable to Prometheus, and all reasonable inferences must be

6  drawn in its favor.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  If there are any

7  genuine issues of material fact, Defendants' motion must also be denied.

8  **III.   DEFENDANTS' MOTION SHOULD BE DENIED WITH PREJUDICE**

9  **A.   Defendants Ask This Court To Make New Law – This Invitation Should Be Rejected**

10       No court has ever held that a treatment method involving a man-made drug is not

11  patentable under §101.  No court has ever held that a discovered correlation occurring from a man-

12  made drug is unpatentable under §101.  It is Congress that sets the limitations of patent protection,

13  *Diehr*, 450 U.S. at 182, and Congress has not excluded from patent protection treatment methods

14  or discovered correlations occurring from a man-made drug.

15       In fact, Congress considered but rejected the opportunity to make treatment methods

16  unpatentable.  In 1995, Congress considered a bill proposing to make methods of medical therapy

17  unpatentable unless performed as a necessary component of a machine, etc.:

18       a patent may not be issued for any invention or discovery of a technique, method,
         or process for performing a surgical or medical procedure, administering a

19       surgical or medical therapy, or making a medical diagnosis, except that if the
         technique, method, or process is performed by or as a necessary component of a

20       machine, manufacture, or composition of matter or improvement thereof which is
         itself patentable subject matter, the patent on such machine, manufacture, or

21       composition of matter may claim such technique, method, or process.

22  *[Exh. 11]*.  This bill was never enacted.  Congress' rejection of such a sweeping change in patent

23  law – the very change Defendants now advocate for[3] – is strong evidence of Congress' intent to

24  _____

25  [3] Prometheus anticipates that Defendants may argue that they are not attacking all medical
    therapy claims.  However, this is specious.  All claims to medical therapies must be based to a

26  certain extent on biological processes.  Defendants' argument that the correlations are "natural
    phenomena" because the administered drug is "automatically" processed in the body, if followed

27  to its logical conclusion, would make all claims to medical therapies unpatentable (such as claims
    to the efficacy of man-made drugs).  The inventors' correlations are no different than claims that

28  claim the efficacy of a man-made drug which are indisputably patentable.  *[See infra at Section
    III.B.2]*.  If this is what Congress intended, they would have passed the 1995 proposed bill instead
    of rejecting it.

1  not make such inventions unpatentable.  Thus, Defendants are asking this Court to make new law,

2  hold what no other court has ever held, and to find unpatentable that which Congress refused to

3  make unpatentable.[4]  For this and the following reasons, Defendants' motion should be denied.

**B.**     **The Claims At Issue Do Not Involve A "Natural Phenomenon"**

4

5     **1.     The Proper Question Is Whether The Thing Alleged To Be A "Natural Phenomenon" Is Naturally Occurring Or Non-Naturally Occurring**

6          The first issue in a §101 analysis is whether there is a law of nature, natural phenomenon or

7  abstract idea involved in the claims at issue.  *Diamond v. Chakrabarty*, 447 U.S. 303, 309-310

8  (1980); *Arrhythmia*, 958 F.2d at 1057.  Defendants proclaim without explanation or support that

9  "[t]here is no doubt that the correlation between 6-TG and 6-MMP metabolite levels and

10  therapeutic efficacy and toxicity is a natural, observable phenomenon."  *[Mem. P's & A's at 11.]*

11  Defendants' conclusory use of the term "natural phenomenon" is not very helpful.  Indeed, Justice

12  Rader has recognized that the terms "laws of nature" or "natural phenomenon" are "vague and

13  malleable terms infected with too much ambiguity and equivocation" because "[e]verything that

14  happens may be deemed 'the work of nature,' and any patentable composite exemplifies in its

15  properties 'the laws of nature.'"  *Arrhythmia*, 958 F.2d at 1063 (concurring opinion).  Judge Rader

16  further noted that "Arguments drawn from such terms for ascertaining patentability could fairly be

17  employed to challenge almost every patent."  *Id.*

18          While the Supreme Court has not defined what are "laws of nature, natural phenomena and

19  abstract ideas," the Court has identified examples that are instructive.  Mathematical equations,

20  such as $E=mc^2$ and the law of gravity, are such examples that are not by themselves patentable

21  inventions.  *Diehr*, 450 U.S. at 185.  Apart from mathematical equations, the examples are few and

22  all pre-date *Diehr*; a new mineral discovered in the earth, a new plant found in the wild, the

23  qualities of natural bacteria, the heat of the sun, electricity, electromagnetism, steam power, and

24  the qualities of metals are examples of "laws of nature, natural phenomena and abstract ideas" that

25

26  _____

27      [4] While Defendants cite two articles to support their positions, these articles are of no consequence.  These articles are not law nor do they even purport to represent the state of the law.

28  Moreover, Prometheus respectfully submits that it is not the place of the district court to ignore clear Supreme Court and Federal Circuit precedent and make new law.

1   are not patentable. *Id.* at 185; *Chakrabarty*, 447 U.S. at 309-310; *Funk Bros. Seed Co. v. Kalo*

2   *Inoculant Co.*, 333 U.S. 127, 130 (1948); *Le Roy v. Tatham*, 55 U.S. (14 How.) 156, 175 (1852);

3   *O-Reilly v. Morse*, 56 U.S. (15 How.) 62, 113-114 (1853).  The term "natural phenomena" uses the

4   word natural.  The examples described above all have this in common as well – they are examples

5   of things that exist naturally without man's actions or manipulation.

6          The Supreme Court's precedent supports this distinction – that naturally occurring things

7   may be a "natural phenomenon" but man-made, nonnaturally occurring things are not.  *C.f. Funk*,

8   333 U.S. 127 *with Chakrabarty*, 447 U.S. at 309-310.  In *Funk*, the patentee discovered that there

9   existed in nature certain strains of species of bacteria that could be mixed without harmful effect to

10  their natural properties.  *Funk*, 333 U.S. at 131.  The patentee used this to produce a mixed culture

11  but the Court held that this discovery was merely a discovery of the natural qualities of the strains.

12  *Id.*  The combination did not change their natural function in any way.  *Id.*  In contrast, the

13  Supreme Court in *Chakrabarty*  held that a "nonnaturally occurring" bacterium could be patented

14  because it had "markedly different characteristics from any found in nature."  *Chakrabarty*, 447

15  U.S. at 310.  The proper distinction was between products of nature and human-made inventions:

16          Congress thus recognized that the relevant distinction was not between
           living and inanimate things, but between products of nature, whether
17          living or not, and human-made inventions. Here, respondent's micro-
           organism is the result of human ingenuity and research.

18  *Id.* at 313.  The Court distinguished the nonnaturally occurring bacterium in *Chakrabarty* from the

19  bacteria in *Funk* because the *Chakrabarty* bacteria was not "nature's handiwork," but man's.  *Id.*

20          **2.     The Correlations Here Are Not "Natural Phenomena"**

21          Similar to *Chakrabarty*, the correlations here are not naturally occurring.  They do not exist

22  because of "nature's handiwork" but because of man.  Thus, the inventors' correlations are not the

23  type of invention meant to be excluded from patent protection under the "natural phenomenon"

24  exception for at least two separate reasons.

25          First, the correlations between the levels of 6-TG and 6-MMP metabolites and

26  toxicity/efficacy are not "natural."  The patents-in-suit claim treatment methods with thiopurine

27  drugs.  Thiopurine drugs are man-made drugs.  *[Exh. 13 at ¶33].*  These man-made drugs are

28  metabolized within the body of the patient to form an "active metabolite" which then treats the

1   patient's disease. *[Id. at ¶33-38]*. However, the 6-TG and 6-MMP metabolites do not naturally

2   exist in the body. In other words, <u>but for the administration of a man-made drug, the metabolites</u>

3   <u>6-TG and 6-MMP would not exist.</u> *[Id. at ¶33]*.[5] Thus, the correlations are not "natural

4   phenomena" as Defendants claim but concern the effects of a man-made drug. Nothing the

5   Defendants rely upon, including the inventors' depositions, contradicts this.[6]

6        The inventors' correlations are no different than patents that claim the efficacy of already-

7   existing man-made compounds. Sophisticated parties have litigated the validity of claims to the

8   efficacy of a man-made compounds before the Federal Circuit and its predecessor court and no one

9   has argued that the efficacy of an existing drug is a "natural phenomenon" because it is a process

10  that occurs in the human body and is therefore unpatentable under §101. *See, e.g., Merck & Co. v.*

11  *Teva Pharm., Inc.*, 347 F.3d 1367, 1369, 1372 (Fed. Cir. 2003); *In re Chupp*, 816 F.2d 643, 645,

12  647 (Fed. Cir. 1987); *In re Halleck*, 422 F.2d 911, 914 (C.C.P.A. 1970). There is no dispute that

13  claims to the efficacy of known man-made compositions are patentable. Prometheus' claims are

14  no more to a "natural phenomenon" than such claims to the efficacy of a known man-made

15  compound. Furthermore, sophisticated parties have litigated over patents to portions of genes and

16  proteins before the Federal Circuit and no such patent has even been invalidated on §101 grounds.

17  *See, e.g., Fiers v. Revel*, 984 F.2d 1164, 1166, 1172 (Fed. Cir. 1993); *In re Bell*, 991 F.2d 781, 782

18  (Fed. Cir. 1993). Claims to portions of genes and proteins (which do exist in nature) are far closer

19  to a "natural phenomenon" than the inventors' correlations. This further shows that the

20  correlations here are just not the type of invention meant to be excluded from patent protection.

21        <u>Second</u>, the correlations are fundamentally different from the examples of things found to

22  be "laws of nature, natural phenomena, or abstract ideas." The principle of $E=mc^2$ is always true,

23  an immutable law. The qualities of naturally occurring bacteria are also always true. In contrast,

24  the inventors' correlations are not absolute truths like these examples. <u>The correlations determined</u>

25

---

26       [5] All of the claims of the patents-in-suit at issue require either a) "administering a drug" to a
    patient *[Exh. 1, Claims 1, 5-7, 13, 14, 22, 24, 25, 30, 32, 33, 35, and 36; Exh. 2, Claim 1]*, or b)
27  require that the drug has already been administered to the patient *[Exh. 1, Claims 46, 52 and 53]*.

28       [6] These depositions merely show that there are indeed correlations between metabolite levels
    and efficacy/toxicity; they do not support Defendants' argument that the correlations are "natural."

by the inventors are man-made associations based on statistical analyses.  The inventors used their knowledge, experience and statistics to analyze patient data to determine 6-TGN and 6-MMP metabolite levels that could be used in methods of treatment for whole patient populations.  *[Exh. 13 at ¶290].*  While the specific levels claimed in the patents are generally applicable across entire patient populations as levels that "indicate a need" to modify subsequent doses, the levels are not an absolute sign of efficacy/toxicity for each and every patient.  *[Id.; Exh. 15 at ¶27-29; Exh. 14 at ¶26-30].*  This is different from the examples of things found to be "natural phenomenon."

Defendants' argument that the correlations are a "natural phenomenon" because they were "pre-existing in the patient population" makes no sense.  Whether or not something is pre-existing has nothing to do with the issue of whether it is natural or man-made.  The proper question is whether the correlations are naturally occurring or the result of man's intervention, and the answer is they are clearly the result of man's-intervention – *i.e.,* the administration of a man-made drug.[7]

Defendants' reliance on the ***dissenting*** opinion in *Lab. Corp.* in support of their position that the correlations at issue in this case are "natural phenomena" is misplaced.  Even if the *Lab. Corp.* dissenting opinion carried any precedential weight, which it does not, its rationale is inapplicable to this case.  At issue in *Lab. Corp.* was a claim which recited a correlation between levels of an amino acid that underline naturally occur in the body, and the diagnosis of a vitamin deficiency.  *Lab. Corp. of Am. Holdings v. Metabolite Labs. Inc.,* 126 S.Ct. 2921, 2924 (2006)(dissenting opinion).  The *Lab. Corp.* claim involved no man-made drug.  Thus, as discussed in more detail below in Section III.I., the rational of the *Lab. Corp.* dissenting opinion is inapplicable to this case.

### 3.   The Fact that the Correlations Are Not "Natural Phenomena" Is Dispositive and Requires the Denial of Defendants' Motion

Defendants have not met their burden of proving this threshold issue - that a "natural

---

[7] In any event, Defendants provide no support for their bold assertion that the correlations pre-existed in the patient population.  Neither the inventors nor the patent ever stated that that the correlations were "pre-existing."  Rather, the inventors and the patents merely describe the patient testing that was needed in order for the inventors to determine what correlations would work across a patient population, and to invent their novel methods of treatment.  *[See also Exh. 1, Examples I and II].*  As mentioned above, the correlations determined by the inventors are man-made associations that work across a patient population based on statistical analyses, as opposed to an absolute truth found in every single patient.  Thus, these correlations did not exist until they were determined by the inventors.

1    phenomenon" is involved. The correlations are not, in fact, "natural phenomena," but are the

2    result of a man-made drug and are, therefore, not natural in any way. This is determinative of the

3    §101 issue. *See Chakrabarty*, 447 U.S. at 309-31 (beginning and ending analysis with

4    determination that claim is <u>not</u> to a "natural phenomenon"). In other words, because a "natural

5    phenomenon" is not involved, no further inquiry is needed. Defendants' motion should be denied

6    with prejudice on this ground alone.

7    **C.    Alternatively, If The Correlations Are "Natural Phenomena," The Claims Do Not "Recite" The Correlations**

8              Assuming for purposes of argument that the correlations are a natural phenomenon, the next

9    question is whether such natural phenomenon actually recited in the claims:

10              We recognize, of course, that when a claim <u>recites</u> a mathematical formula (or
              scientific principle or phenomenon of nature), an inquiry must be made into
11              whether the claim is seeking patent protection for that formula in the abstract.

12   *Diehr*, 450 U.S. at 191. If the claims do not recite a "natural phenomenon," then there is no need

13   to inquire into whether the claims are seeking patent protection for the phenomenon in the abstract.

14   *In re Pardo*, 684 F.2d 912, 916 (C.C.P.A. 1982)(ending §101 inquiry after finding that claims did

15   not "recite" mathematical algorithm). In *Diehr*, *Arrythmia*, *Alappat*, and *AT&T*, the Courts found

16   the algorithm to be actually "recited." *Diehr*, 450 U.S. at 1056; *Arrythmia*, 958 F.2d at 1055,

17   1059; *Alappat*, 33 F.3d at 1540, 1544; *AT&T*, 172 F.3d at 1355, 1357. That is not the case here.

18              Here, the claims at issue do not "recite" the three correlations. What the inventors invented

19   are treatment methods – methods for optimizing the therapeutic efficacy and methods for reducing

20   toxicity of treatment with thiopurine drugs for immune mediated gastrointestinal disorders and

21   autoimmune diseases. *[Exh. 1 at Claim 1; Appendix C]*. It is these treatment methods that are

22   claimed. The claims at issue <u>do not</u> state that efficacy is correlated with 6-TG metabolite levels

23   above about 230 pmol per $8 \times 10^8$ red blood cells, nor do the claims state that toxicity is correlated

24   with 6-TG levels above about 400 pmol per $8 \times 10^8$ red blood cells or 6-MMP levels above about

25   7000 pmol per $8 \times 10^8$ red blood cells. From preamble to the last step of indicating a need, the

26   claims at issue claim a treatment method. Unlike claims found in many other issued patents,

27   including *Lab Corp.*, the claims in this case do not include a correlating step.

28              Defendants' argument that the "warning" step equals the correlations because it is not an

1    "active" step is incorrect.  This Court has already interpreted the "indicates a need" element to

2    include a warning that subsequent doses may need to be adjusted:

> this Court finds the phrase ["indicates a need"] means that when the
> identified metabolites reach the specified level, **the doctor is warned
> or notified** that a dosage adjustment may be required

5    *[Exh. 12 at 17-18 (emphasis added)]*.  The Court did not rule that some unidentified person need

6    only "think about" the levels.  Rather, while the Court did reject Defendants' argument that doses

7    had to actually be adjusted in Claim 7, the Court specifically held that the claims require that the

8    doctor be "warned or notified" that a dosage adjustment may be required.  *[Id. at 17-18]*.  Thus,

9    the required "warning" is an active step (even though it is not the action Defendants argued for).

10   Given that *Diehr* requires that each and every claim element must be considered, this warning

11   cannot be ignored and read-out of the claims as Defendants attempt.

12   Defendants' reliance on the ***dissenting*** opinion in *Lab. Corp.* in support of their position

13   that the claims recite correlations is misplaced.  Even if the *Lab. Corp.* dissenting opinion carried

14   any precedential weight, which it does not, its rationale is inapplicable here.  The *Lab. Corp.* claim

15   expressly claimed "correlating an elevated level of total homocysteine . . . with a deficiency."  *Lab.*

16   *Corp.*, 126 S.Ct. at 2924 (dissenting opinion).  The claims at issue here do not claim any

17   "correlation" – they claim 1) administering a drug for specific diseases, 2) determining metabolite

18   levels with the results in red blood cells, and 3) providing a warning based on specific levels that

19   doses may need to be adjusted.  That the warnings provided in this case may be based on three

20   correlations does not change the fact that the claims do not recite the mere correlations.  Thus, as

21   discussed in more detail below in Section III.I., the rationale of *Lab. Corp.* is inapplicable.

**D.   <u>Alternatively, If The Claims At Issue "Recite" A "Natural Phenomena," The Claims
Are Patentable</u>**

   **1.   Mayo Fails To Consider The Claims As A Whole And Improperly
   Dissects The Claims**

24   Even if the Court finds that the correlations in this case are "natural phenomena" (which

25   Prometheus disputes), the claimed inventions, when properly considered as a whole, are patentable

26   under the alternative two-part test for §101.

27   Defendants wrongly ask the Court to ignore the administration and determining steps of the

28   claims on the ground that they are "old" and not "novel."  This is plainly improper under *Diehr*.

1   The claims must be considered as a whole to determine whether the claim is a practical application

2   of the "natural phenomenon" or is the natural phenomenon itself. *Diehr*, 450 U.S. at 187, 188.

3   The claim cannot be dissected into "old" and "new" elements. *Id.*  Further, "novelty" is <u>irrelevant</u>

4   to patentability under §101. *Id.* at 191, 193, n. 15.  Thus, the Court must flatly reject Defendants'

5   argument that the claims at issue are invalid because the claims combine steps "known in the prior

6   art" with the correlations or because the administration and determining step "offers nothing new."

7   Indeed, Defendants' argument was expressly rejected by the *Diehr* court.  In *Diehr*, the infringer

8   argued that "if everything other than the algorithm is determined to be old in the art, then the claim

9   cannot recite statutory subject matter." *Id.* at 189 n.12.  The Court rejected this argument:  "To

10  accept th[is] analysis . . . would, if carried to its extreme, make all inventions unpatentable because

11  all inventions can be reduced to underlying principles of nature which, once known, make their

12  implementation obvious." *Id.*

13         Moreover, Defendants' argument that the administration and determining steps cannot be

14  considered because they are "necessary prerequisites to any practical use of the correlation" is

15  specious.  In *Diehr*, putting raw rubber into the mold was well known in the art and a "necessary

16  prerequisite" to use the method claim which had a series of steps for constantly measuring the

17  temperature inside the rubber mold and feeding those measurements into a computer that

18  calculates the cure time for the rubber. *Id.* at 177-180.  Despite the fact that putting raw rubber

19  into the mold was a "necessary prerequisite" to practice the claim, the Supreme Court held that the

20  claim transformed raw rubber into a different state or thing. *Id.* at 183-184.

21         Furthermore, Mayo's argument that the administering and determining steps should be

22  ignored because they are "necessary data-gathering steps" is also incorrect.  The phrase "necessary

23  data-gathering steps," which comes from *In re Grams*, 888 F.2d 835, 839 (Fed. Cir. 1989) and not

24  *Diehr* as Defendants assert, was used to describe a claim that contained nothing more than a

25  mathematical algorithm and steps to gather the data required to perform the algorithm, which the

26  Court found was not patentable subject matter.  However, this concept has only been discussed in

27  mathematical algorithm cases and, thus, its application here is suspect.  In the claims here,

28  administering and determining are necessary to provide treatment to the patient and thus have a

1  purpose beyond mere data gathering.  In any case, later Federal Circuit cases have criticized

2  *Grams* because the court did not consider whether the end result was "useful, concrete, and

3  tangible."  Thus, *Grams* cannot be relied upon.  Even if the administering and determining steps

4  are "necessary data-gathering" (which they are not), the result of the claims is still "useful,

5  concrete, and tangible" *[see infra at section III.D.3]* and thus satisfies §101.

6       When the claims are considered as a whole (which they must be), the claimed inventions

7  meet both the transformation and results alternative tests.

8       **2.    The Claimed Methods Transform An Article Into A Different State**

9       The inventions "transform" an article into "a different state or thing" in multiple ways.

10  First, the administered man-made drug is transformed.  This man-made drug is transformed in the

11  body so that it has an effect in the blood – the creation of the non-naturally occurring metabolites

12  6-TG and 6-MMP.  Thus, the drug is transformed into metabolites.  *[Exh. 13 at ¶33]*.

13       Second, the blood of the patient being tested for metabolite levels is transformed into a

14  different state.  There are various methods for determining metabolite levels.  6-TG and 6-MMP

15  metabolites are not detectable without transformation of the human tissue being tested.  *[Theoret*

16  *Decl. at ¶7]*.  High pressure liquid chromatography ("HPLC") is one such method for determining

17  metabolite levels (and is specifically claimed in several dependent claims at issue).  *[Id. at ¶4-5]*.

18  To perform HPLC according to one method referenced in the patents-in-suit, significant physical

19  and chemical alteration of human blood is required.  *[Id. at ¶5]*.  There are several other methods

20  for determining 6-TG and 6-MMP metabolite levels all of which alter and manipulate the blood or

21  other human tissue to extract the metabolites and then determine the concentrations.  *[Theoret*

22  *Decl. at ¶5-7; Exh. 3-8]*.  Thus, the determining step requires significant chemical and physical

23  alteration of the blood or human tissue such that it ends-up in a different state (*i.e.*, it is not human

24  blood or human tissue by the end of the process but an altered substance).  *[Theoret Decl. at ¶6]*.

25       Third, the determined metabolite levels (which are raw numbers in units that are

26  "pmol/8x10$^8$ red blood cells") are transformed into a warning for subsequent treatment.  A warning

27  is then provided that subsequent doses may need to be adjusted at specific metabolite levels.  Thus,

28  the resultant output is a warning for subsequent patient treatment.

1    Defendants argue that it does not matter that the warning given according to the claims first

2  requires the transformation of blood.  This argument, however, ignores *Diehr* and *Arrhythmia*.

3  The transformations that take place in the claims at issue are analogous to the transformations that

4  conferred patentability in *Diehr* and in *Arrhythmia*.  In *Diehr*, the claims involved the

5  "transformation of an article, raw, uncured synthetic rubber, into a different state or thing."  *Diehr*,

6  450 U.S. at 184.  The method employed an algorithm but the Court determined the method claim

7  was not directed solely to a mathematical formula.  Rather, the method employed a well-known

8  mathematical equation in a particular application.  *Id.*  The method did not contain any limitations

9  to the rubber itself, its state or properties.  *Id.* at 179, n.5  Rather, the method claimed a series of

10  steps for constantly measuring the temperature inside the rubber mold and feeding those

11  measurements into a computer that calculates the cure time for the rubber.  *Id.* at 178-180.

12  However, the result of all these steps was the transformation of raw rubber into molded rubber.

13  Similarly here, while the asserted claims do not contain limitations to human blood itself, its state

14  or properties, the claims at issue do require determining metabolite concentrations, result of which

15  is a transformation of the drug, blood and resulting metabolite levels as described above.

16    In *Arrhythmia*, the Federal Circuit held that a method to analyze a heartbeat is patentable

17  under §101.  The method analyzed electrical signals from a patient's heart by converting the signal

18  into a value and then comparing that value to a predetermined value to predict vulnerability to

19  ventricular tachycardia immediately after a heart attack.  *Arrhythmia*, 958 F.2d at 1059.  The

20  *Arrhythmia* method claimed the steps of "converting" signals to time segments, "applying" a

21  portion of the time segments to a filter "determining" a value, and "<u>comparing said value with said</u>

22  <u>predetermined level</u>."  *Id.* at 1055.  The Court found that comparison of the resulting output to a

23  predetermined level provides an indication whether the patient is at high risk for ventricular

24  tachycardia.  *Id.* at 1059.  "The resultant output is not an abstract number, but is a signal related to

25  the patient's heart activity."  *Id.*  Similarly, in the claims at issue here, the resultant output provides

26  a warning (an indication) that subsequent doses may need to be adjusted.  The output "is not an

27  abstract number, but is a signal" for subsequent doses.  Thus, like *Arrhythmia*, the methods

28

1    transform mere metabolite concentrations into an indication for future treatment.[8]

2    ### 3.    Alternatively, The Claimed Methods Produce A Useful, Concrete and Tangible Result

3    As described above, there are two alternative ways an invention may be patentable even if

4    it includes a "natural phenomenon." The second alternative way is that an invention that utilizes a

5    "law of nature, natural phenomenon or abstract idea" is patentable when it produces a "useful,

6    concrete, and tangible result" beyond the abstract idea itself. *State Street*, 149 F.3d at 1373;

7    *Alappat*, 33 F.3d at 1544; *AT&T*, 172 F.3d at 1360. Here, the inventions meet this alternative test.

8    First, the warning provided according to the claims is a "useful, concrete, and tangible

9    result." At the end of the performance of the method, the party performing the determining step

10   will have raw metabolite levels that represent the levels of 6-TG and 6-MMP found in the patient's

11   blood. Then, the claims require the provision of a warning that doses may need to be adjusted if

12   the levels are less than about 230 pmol per $8 \times 10^8$ red blood cells or greater than about 400 pmol

13   per $8 \times 10^8$ red blood cells (or in some claims at issue, greater than about 7000 pmol or $8 \times 10^8$ red

14   blood cells). This provides the treating physician with not only the levels in the blood of the

15   patient being tested but an indication of what to do with those levels. The warning may be written

16   (as Defendants intended to do with their infringing test), or could be verbal. Either way, the

17   warning is a "useful, concrete, and tangible result."

18   Second, better patient care is a "useful, concrete, and tangible result." These methods give

19   doctors an important factor to consider in determining future therapy for their patients on

20   thiopurine drugs and improves the patient's chances of receiving proper treatment. Indeed,

21   Defendants' own doctors have ordered Prometheus' test more than 17,000 times. *[Exh. 16 at ¶25]*.

22   Further, one of Defendants' reasons for offering a metabolite test designed to "replace"

23   Prometheus' test was allegedly for "better patient care." *[Exhs. 17 & 18]*. While other documents

24

25

26   [8] That *Arrhythmia* and *Diehr* both involved machines is not important. The Court of Appeals that preceded the Federal Circuit has ruled that it is of little relevance whether a claim is directed to

27   a machine or process for a §101 analysis. *In re Musgrave*, 431 F.2d 882, 893 (CCPA 1970). Claims do not become unpatentable subject matter merely because some or all of the steps are performed by the human mind or involve thought processes. *Id.* The Federal Circuit adopted the

28   law of the CCPA as binding precedent. *South Corp. v. U.S.*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).

1   show that the reason was really to make a profit, Defendants at least claim that this makes patient

2   care better.  Thus, there can be no dispute that the patented methods improve patient care.

3   **E.   Even If The Claims At Issue Involve "Natural Phenomena," The Claims At Issue Do Not "Wholly Preempt" Public Use Of Such "Phenomena"**

4   Defendants ignore the alternative transformation/results tests just described and, instead,

5   rely solely on an argument that the claims at issue are invalid because they "preempt" others from

6   using the correlations determined by the inventors.  This argument is wrong for three reasons.

7   First, Defendants incorrectly suggest that there is something wrong with foreclosing others

8   from using the correlations in conjunction with all of the other steps of the claimed methods.  Clear

9   Supreme Court and Federal Circuit precedent provides that a patentee may properly preclude

10  others from practicing an invention employing a natural phenomenon when it is used "in

11  conjunction with all the other steps in their claimed process":

12
> In contrast, the respondents here do not seek to patent a mathematical formula.
13  Instead, they seek patent protection for a process of curing synthetic rubber.
> Their process admittedly employs a well-known mathematical equation, but they
14  do not seek to preempt the use of that equation. Rather they seek only to
> foreclose from others the use of that equation in conjunction with all of the other
15  steps in their claimed process.

16  *Diehr*, 450 U.S. at 187; *see also Arrhythmia*, 958 F.2d at 1059.  Thus, in *Diehr*, the patentee could

17  exclude others from using the patented process to cure rubber.  In *Arrhythmia*, the patentee could

18  exclude others from using the patented method to analyze electrocardiograph signals to determine

19  a specified heart activity.  This case is no different than *Diehr* and *Arrhythmia*.  Like *Diehr* and

20  *Arrhythmia*, the inventors do not seek to patent the correlations themselves.  Rather, the claims

21  cover treatment methods.  There is nothing wrong with foreclosing others from using the claimed

22  treatment methods.  And, to be clear, anyone and everyone, including every doctor and hospital, is

23  free to use the claimed treatment methods by simply ordering the test from Prometheus.

24  Furthermore, it must be noted that Defendants' infringement has been done for money, and not for

25  altruistic reasons as they imply.  Defendants' own documents show that they infringed in part

26  because they identified Prometheus' test as the highest dollar test.

27  Second, the question is whether the claimed invention "wholly preempts" all other uses of

28  the natural phenomenon. *Diehr*, 450 U.S. at 175; *Alappat*, 33 F.3d at 1544; *Arrhythmia*, 958 F.2d

at 1059.[9]  Thus, the question is not whether any use is foreclosed (as Defendants suggest) because, as just described, foreclosing use of a natural phenomenon in conjunction with all of the steps in the claimed process is entirely proper.  Even assuming that the claims at issue expressly claim the correlations themselves and thereby claim a "natural phenomena," which Prometheus disputes, the claims do not "wholly preempt" all other uses of the correlations.  The claims only foreclose use of the claimed methods.  The claims do not "preempt," for example, any of the following uses:

- The claims at issue do not foreclose a doctor or researcher from using the correlations for research and not in patient treatment.  This is because the claims are to treatment methods.  Dr. Cuffari, who is a third party in this case, has tested metabolite levels and used the correlations in his research but never for patient treatment.  *[Exh. 19 at 24:6-26:18].*

- The claims at issue do not foreclose doctors or researchers from using the correlations and even the inventors' treatment method for diseases other than immune mediated gastrointestinal disorders and autoimmune diseases.

- The claims at issue do not foreclose anyone from providing results in units other than red blood cells.

- The claims at issue do not foreclose doctors and researchers from building on the correlations between toxicity/efficacy and metabolite levels to find new levels for other indications so long as they either a) do not use the specific treatment methods claimed in the patents-in-suit, or b) order the test through Prometheus.

- The claims at issue do not foreclose scientific journals from publishing articles testing, discussing or even criticizing the correlations.  Doctors and researchers are not foreclosed from discussing and elaborating on the implications of these correlations.  The claims at issue do not restrict any dissemination of information regarding the correlations because the claims are narrowly drawn to administering, determining and providing a warning based on certain levels for patients with particular diseases being treated with specific drugs.

- The claims at issue do not foreclose anyone from testing and determining metabolite levels so long as the doctors are not warned that doses may need to be adjusted as required by the claims.  MML and MCR, however, did more than this - each chose to provide the warning covered by the patents-in-suit.  MML did that in offering their test for sale because the June 2004 Implementation Notice "warns physicians that, when metabolite levels reach above a certain point, an adjustment in dosage may be warranted."  *[Exh. 12 at 21:13-22].*  MCR

---

[9] Even in the *Benson* case Defendants rely upon for this argument, the Court looked at whether the claim "wholly preempted" all uses.  *See, e.g., Gottschalk v. Benson,* 409 U.S. 63, 71-72 (1972).  The Court found that the claims would preclude every possible use of the mathematical algorithm and, because of this, the claims were not patentable.  The *Benson* court rejected the claim because it did not contain any particular application of the mathematical algorithm but merely claimed the formula itself.  In contrast, the claims at issue provide a particular application – treatment of specific diseases.  In any event, this case predated *Diehr* (which makes its applicability questionable) and, therefore, did not consider the transformation/useful result test of *Diehr* and cases following *Diehr.*  Defendants' reliance on *Parker v. Flook,* 437 U.S. 584 (1978) is also misplaced.  The Supreme Court agreed with the patentee that the claims did not seek to "'wholly preempt the mathematical formula' outside the petrochemical and oil-refining industries that remain in the public domain." *Id.* at 589-590.  The Court found the claims to be unpatentable for different reasons described more fully below.  Thus, neither case supports Defendants' argument.

did this because the lab warned Dr. el-Azhary that the therapeutic range for metabolite levels is between 235 and 400." *[Exh. 20 at ¶64-68; see infra footnote 12].*

These are but a few examples but they prove that Defendants have not met their burden of showing that the patented treatment methods "wholly preempt" all uses of the correlations.

Third, in *Diehr* and all post-*Diehr* Federal Circuit cases, when the court has upheld a claim because it either a) transforms an article, or b) produces a useful, concrete and tangible result, the court has also found that the claim did not "preempt" all other uses of the natural phenomenon or abstract idea. *See, e.g., Diehr*, 450 U.S. at 187; *Arrhythmia*, 958 F.2d at 1059; *Alappat*, 33 F.3d at 1544; *AT&T*, 172 F.3d at 1357. This makes complete sense because a claim that transforms an article or produces a useful result would only be foreclosing use of the natural phenomenon or abstract idea for that particular application – not all other uses. Thus, the primary question is whether the claims at issue meet either of the alternative transformation/result tests.

Further, Defendants misapply both *Benson* and *Flook* (which are both pre-*Diehr* which makes their applicability questionable). Defendants misuse *Benson* for their argument that, where only "insignificant steps" integral to using the subject matter of the claim exist, the claim is not patentable. In *Benson*, the problem was not that the claims included "insignificant steps," as Defendants claim, but that the claim was only to the mathematical algorithm and included no limitation to any art, technology, or use. *Benson*, 409 U.S. at 71-72. In contrast, the claims at issue <u>are</u> to a specific use with other specific limitations. Thus, *Benson* is inapplicable.

Defendants similarly misuse *Flook*. In *Flook*, the claim was to a method of updating "alarm limits" (i.e., numbers). Using the formula provided in the claims, an updated alarm limit could be calculated if several other variables were known. The Supreme Court found that the claimed methods were severely lacking because they did not explain how the variables used in the formula were to be selected. *Flook*, 437 U.S. at 586. The patent did not disclose the chemical process at work, the monitoring of those process variables, or the means of setting off an alarm system. *Id.* Thus, all the claims provided was a bare mathematical formula. Because of this, the claim was not patentable. *Id.; see also, Diehr*, 450 U.S. at 186-187 (distinguishing *Flook*). Here, the patents-in-suit explain the correlations and the claims at issue go far beyond the mere correlations to provide a very specific treatment method.

**F.     Prometheus Is Entitled To Foreclose Defendants And Their Doctors From Using The Patented Treatment Methods**

As described above, *Diehr, Arrhythmia*, and others acknowledge that Prometheus is entitled to foreclose others (such as MML, MCR and their doctors) from using the claimed treatment methods.  Thus, there is nothing illegal, improper, or against public policy, about enforcing patent rights against anyone, even against doctors.  As described above, Congress already rejected making treatment methods unpatentable.  Instead, Congress legislated certain limits on the remedies available for patent infringement against doctors and other health care providers, but still allow both to be sued for infringement.  35 U.S.C. §287.  Congress passed this provision to address concerns that patents on methods of practicing medicine might prevent some doctors and hospitals from providing the best medical care out of fear of infringement.  *See* H.R. Rep. No. 104-863, at 853 (1996).  However, Congress specifically excluded from this exception persons engaged in the "commercial development" of "clinical laboratories services" by providing that the exception does not apply to such persons.  35 U.S.C. §287(c)(3).  MML (a commercial clinical laboratory) and the biochemical genetics lab at MCR (where the commercial infringing metabolites test is planned to be performed) are such "clinical labs" that do not qualify for the protections of §287.  Thus, Defendants' allegation that the patents are "dangerous" for the medical community is preposterous.  While Prometheus has never in fact sued a doctor for infringement, it is entirely permissible to do so.

In this case, Prometheus seeks to stop two acts of infringement: 1) the offer for sale, sale, or use of the test described in Defendants' June 9, 2004 Implementation Notice (which this Court already found infringes Claim 7 of the patents-in-suit); and 2) MCR's use of the claimed treatment methods in connection with a study involving dermatological patients ("Derm Testing").  The Derm Testing was done at MCR as part of the development of Defendants' commercial test.  *[Exh. 21 at 133:15-134:13; 57:12-21].*  It was not independent scientific research as Defendants portray but had a commercial purpose.  Thus, Prometheus sued both MML and MCR for these two acts of infringement.[10]  Defendants' accusation that Prometheus' is suing doctors and stifling research

---

[10] Defendants' insinuation that Prometheus' infringement contentions support Defendants' arguments is not true.  MCR provided the "warning" required by the claims when MCR returned
(continued...)

1   ignores the facts that the Derm Testing had a commercial purpose and is totally irrelevant.

2   **G.   A Finding That The Claims At Issue Are Invalid Under 35 U.S.C. §101 Could Have Wide-Spread Adverse Implications For Thousands Of Patents**

3   Patents have routinely been granted for diagnostic and therapeutic methods that consist of

4   an assay or some other form of measurement, followed by a "correlation" step or some other

5   functionally similar activity.  In fact, Defendants have obtained many such patents *[Appendix A]*

6   and, although they argue here to the Court that such patent claims are unpatentable, Defendants

7   have not dedicated those patents to the public.  For example, in 1999, claim 1 of U.S. Patent No.

8   5,928,883 issued to the Mayo Foundation for Medical Education and Research:

9   
10   
11   
12   
> 1.  A diagnostic method comprising:
> **obtaining a physiological sample** of material from the gastrointestinal tract of a human suspected of affliction with, or afflicted with, an inflammatory bowel disorder; and
> **determining the level** of the eosinophil pro-inflammatory granule protein eosinophil peroxidase in said sample, **wherein the level is correlated to the presence or absence of said inflammatory bowel disorder**.

13   *[Appendix A at 1]*.  Defendants' patent is far closer to *Lab. Corp.* than Prometheus' claims.  In

14   addition, there are thousands of third party patents with similar claims for life saving medical tests,

15   such as the Prostrate Specific Antigen test for prostate cancer, a test for HIV/AIDS, the HER-2/neu

16   test for breast and ovarian cancer, and the test for neoplastic (i.e., cancerous) tissue.  *[See, e.g.,*

17   *Appendix B]*.  That there are so many examples attests to the importance of the patent system that

18   incentivizes inventors to create, develop and share their inventions in exchange for limited patent

19   protections.  Had patent protection not been available for these inventions, the world may never

20   have received the benefits of these life saving tests.

21   Virtually every patent claim concerning a diagnostic method relies, explicitly or implicitly,

22   on a correlation between a test result and a disease or a medical condition.  Thus, the repercussions

23   for biotechnology if this Court should make new law would be staggering.  Such a decision could

24   _____

25   (...continued from previous page)
the results of metabolite testing to Dr. el-Azhary with a warning that the "Therapeutic Range" was
26   "235-400."  While Prometheus believes that this meets the "indicates a need" element of the claims, this is an infringement issue – not an issue to be decided under §101.  Further, while
27   Prometheus believes that giving this warning once for all results returned by MCR to Dr. el-Azhary is no different than if the warning had been provided with each and every test result, this
28   too is an infringement issue – not an issue to be decided under §101.  Thus, Defendants' entire argument about what the Derm Testing includes or does not include is irrelevant for this motion.

1   be used by others (until a higher court says otherwise) to call thousands of patents into question –

2   even Defendants' own patents.  Such a question is best reserved for Congress or an appellate court.

3   **H.   *Lab. Corp. v. Metabolite Labs.* Is Not Law And Should Not Be Considered By This Court In Any Manner**

4   While Defendants try to pretend that the *Lab. Corp.* opinion is law (and applies it as if it

5   had precedential weight), it is not.  The *Lab. Corp.* opinion is a ***dissenting*** opinion given by only

6   three justices.  In addition, it is a dissent not from a decision on the merits, but rather from a

7   dismissal of a writ of certiorari because the writ had been "improvidently granted."  In other

8   words, the majority of the Court decided not to issue an opinion on the merits of the §101 issue

9   because the issue had not been raised and decided below.  Thus, Defendants' claim that this

10  dissenting opinion "is a clear signal from many on the Court that if Lab. Corp. had properly raised

11  the 35 U.S.C. §101 issue before the trial court and the Federal Circuit the patent would have been

12  struck down" is entirely false.  Three out of nine justices is hardly "many on the Court."

13  Moreover, these three justices' personal views are based on an incomplete record.  *Lab.*

14  *Corp.*, 126 S.Ct. at 2926.  The dissent recognizes that the §101 issues were not raised in the

15  Federal Circuit or district court.  Thus, there was not a full record before these three justices to

16  determine whether or not the claims involved a natural phenomenon, whether the claims

17  transformed an article, whether it produced a "useful, concrete, and tangible result," or whether the

18  claim did in fact preempt others.  This is another reason to not consider the *Lab. Corp.* dissent.

19  In addition, the dissent[11] admits that its analysis may be wrong:  "Even if Part III is wrong,

20  however, it still would be valuable to decide this case" to help diminish uncertainty in the area.  *Id.*

21  at 2929.  Part III is the portion of the dissent Defendants rely upon.

22  Finally, since *Lab. Corp.*, the PTO has issued more than a dozen patents with claims

23  similar to the *Lab. Corp.* claim.  *[Appendix B at 51-63].*  That the PTO has not called such patents

24

25

---

26  [11] Moreover, Justice Stevens' view of §101 appears to be the view of a minority of the Court because Justice Stevens has disagreed with the Court's majority opinions on §101 in the past.

27  Over 25 years ago, Justice Stevens declared in his dissent in the *Diehr* case that "no program-related invention should be a patentable process under §101 unless it makes a contribution to the art that is not dependent entirely on the utilization of a computer" – a view that the Supreme Court

28  has clearly rejected.  *See Diehr*, 450 U.S. at 219 (Stevens dissent).

into question is further evidence of the dissent's lack of precedential effect.

**I.      Even If The Court Considers _Lab. Corp._ It Does Not Change The Conclusion That Defendants' Motion Should Be Denied**

If the Court considers the _Lab. Corp._ dissent, the claim at issue in _Lab. Corp._ is so different from the claims here, that the dissenting opinion has no applicability to this case whatsoever.

First, a side-by-side comparison of the _Lab. Corp._ claim with Claim 1 shows that there are many key differences between the two claims:

| Claim 1, '623 Patent | _Lab. Corp._ **Claim 13** |
| --- | --- |
| • Limited to specific diseases - immune-mediated gastrointestinal disorders and autoimmune diseases<br>• Limited to specific drugs | • Not limited to any disease or condition<br>• Not limited to any drug |
| • Step of administering a man-made drug. | • No man-made drug involved |
| • Step of determining nonnaturally occurring metabolite levels<br>• Determining step performed in a manner that produces the result in red blood cells<br>• Some claims specific to determining using HPLC method | • No direction or limitation on how to perform the "assay" to detect naturally occurring amino acid levels\<br>• No limitation to providing results in any unit or form<br>• No limitation to any particular assay method |
| • Step of providing a warning that adjustment in dose may be required if level is less than about 230 pmol per $8 \times 10^8$ red blood cells or greater than about 400 pmol per $8 \times 10^8$ red blood cells (or about 7000 pmol per $8 \times 10^8$ red blood cells in some claims). | • No warning or other direction provided<br>• No specific levels used<br>• Claims ("recites") correlation itself |

_[Appendix C]._  These differences make the dissent's reasoning in _Lab. Corp._ inapplicable here.

Second, the _Lab. Corp._ claim is to things that naturally occur in the body.  Homocysteine is an amino acid that naturally occurs in the body.  _[Exh. 22]._  In other words, without any man-made drugs, homocysteine naturally exists in the body.  Thus, the claim in _Lab. Corp._ concerned measuring a substance that was natural in the body and correlating the resulting levels with a vitamin deficiency.  In contrast, here, 6-TG and 6-MMP metabolites are not naturally occurring in the body – these metabolites are not created in the body unless a man-made drug is administered.  Thus, the claims at issue concern the administration of a man-made (_i.e._, not natural) drug, the measurement of man-made (_i.e._, not natural) metabolites, and man-made warnings for what the resulting levels of those man-made metabolites mean.  Because of these differences, the dissent's announcement that "there can be little doubt that the correlation between homocysteine and

1  vitamin deficiency set forth in claim 13 is a 'natural phenomenon'" is not true for the claims at

2  issue here.  Further, in *Lab. Corp.*, the patentee did not argue that the claimed correlation was <u>not</u> a

3  "natural phenomenon."  *Lab. Cop.*, 126 S.Ct. at 2927.  That is certainly not the case here.

4       Third, the dissent's statement that the *Lab. Corp.* claim was not a process for transforming

5  blood is also not applicable here.  *Id.* at 2927-2928.  In the first place, the dissent's analysis

6  conflicts with *Diehr* and *Arrhythmia* which <u>are binding precedent</u>.  In *Diehr*, Claim 1 did not

7  include any particular rubber mold or rubber molding process.  *Diehr*, 450 U.S. at 181, n. 5.  The

8  method provided a process for constantly measuring the actual temperature inside any mold in any

9  molding process to calculate the cure time of the rubber.  *Diehr*, 450 U.S. at 178-179.  Thus, *Diehr*

10  was no different than *Lab. Corp.* where, according to the dissent, the claim "tells the user to use

11  any test at all."  *Lab. Cop.*, 126 S.Ct. at 2927.  Yet, the dissent ignored that *Diehr* found a

12  transformation of matter.  The dissent also ignored that, in *Arrhythmia*, which provided a method

13  claim for analyzing electrocardiograph signals in order to determine a specified heart activity, the

14  method claim included a step of "converting a series of QRS signals to time segments" but did not

15  specify any particular machine or method for this conversion, yet there was a transformation of

16  matter.  *Arrhythmia*, 958 F.2d at 1055.  The rule of *Diehr* and post-*Diehr* cases is that no element

17  can be ignored.  Yet, the dissent did just that – they ignored the "assay" step of the method.  In

18  addition, the claims at issue here specifically require that measurement of metabolite levels

19  produce a result in the unit of red blood cells as opposed to merely claiming any method of

20  detecting metabolite concentrations.  Some dependent claims further require that metabolite levels

21  be determined using HPLC.

22       Finally, the dissent's refusal to consider whether the *Lab. Corp.* claim produced a "useful

23  concrete, and tangible result" is also inapplicable here.  *Lab. Corp.*, 126 S.Ct. at 2928.  The Federal

24  Circuit has held in three cases (*State Street*, *Alappat*, and *AT&T*) that a "useful concrete, and

25  tangible result" alone (*i.e.*, without a transformation of an article) can show patentability.  The

26  dissenting opinion of only three justices of the 9 judge Supreme Court does not overrule the

27  Federal Circuit's clear precedent.  Moreover, as described above, *State Street*, *Alappat*, and *AT&T*

28  found a "useful concrete, and tangible result" because the claims went beyond merely providing

the mathematical algorithm used by the claims.  These Federal Circuit decisions show that the Court carefully considered the Supreme Court's precedent on §101 and held that an invention that employs a "law of nature" etc. may be patentable if it produces a "useful concrete, and tangible result."  Federal Circuit precedent is binding precedent on this Court, unlike the *Lab. Corp.* dissent.

Thus, a careful review of what was at issue in *Lab. Corp.* compared to the claims of the patents-in-suit at issue here show that the two are not analogous as Defendants claim, but really fundamentally different.  Because of this, the dissenting opinion has no applicability to this case.

## IV.    THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE GRANTING DEFENDANTS' MOTION

While Prometheus believes that Defendants' invalidity argument based on §101 should be rejected and their summary judgment motion denied with prejudice, if the Court does not agree, there are disputed issues of material fact that prevent this Court from granting Defendants' motion. While the issue of whether a claim is directed to statutory subject matter is a question of law, the "determination of this question may require findings of underlying facts specific to the particular subject matter and its mode of claiming."  *Arrhythmia*, 958 F.2d at 1056.  There are several underlying factual issues precluding judgment in Defendants' favor:  1) whether the claims at issue claim a "natural phenomenon"; 2) whether the claims at issue transform an article into a different state or thing; 3) whether the claims at issue produce a useful, concrete, and tangible result; and 4) whether the claims at issue "wholly preempt" all uses of the inventors' correlation.  These determinations are all based on facts that are in dispute and, therefore, summary judgment cannot be granted in Defendants' favor.

## V.    CONCLUSION

For the foregoing reasons, Prometheus respectfully requests that Defendants' motion for summary judgment of invalidity under 35 U.S.C. §101 be denied with prejudice.

Dated:  February 28, 2007

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   s/ Natalie J. Morgan
Natalie J. Morgan
Email:  nmorgan@wsgr.com

Attorneys for Plaintiff Prometheus Laboratories Inc.

## CERTIFICATE OF SERVICE

U.S. District Court, Southern District of California,
Case No. 04CV1200 JAH (RBB)

I, Kris O'Connor, declare:

    I am and was at the time of the service mentioned in this declaration, employed in the County of San Diego, California. I am over the age of 18 years and not a party to the within action. My business address is 12235 El Camino Real, Ste. 200, San Diego, CA, 92130.

    On February 28, 2007, I served a copy(ies) of the following document(s):

**PROMETHEUS LABORATORIES INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY UNDER 35 U.S.C. § 101 (WITH APPENDICES A-C)**

on the parties to this action by placing them in a sealed envelope(s) addressed as follows:

| Attorney | Party(ies) Served | Method of Service |
|---|---|---|
| Jennifer Bush, Esq.<br>Fish & Richardson P.C.<br>12390 El Camino Real<br>San Diego, CA 92130-2081<br>Tel.: 858 678-5070<br>Facsimile: 858 678-5099 | Attorneys for:<br>MAYO COLLABORATIVE SERVICES dba MAYO MEDICAL LABORATORIES and<br>MAYO CLINIC ROCHESTER | CM/ECF and U.S. Mail |
| Jonathan E. Singer, Esq.<br>Michael J. Kane, Esq.<br>Fish & Richardson P.C.<br>3300 Dain Rauscher Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402-4403<br>Tel.: 612 335-5070<br>Facsimile: 612 288-9696 | Attorney for:<br>MAYO COLLABORATIVE SERVICES dba MAYO MEDICAL LABORATORIES and MAYO CLINIC ROCHESTER | CM/ECF and U.S. Mail |

☒   (BY MAIL) I placed the sealed envelope(s) for collection and mailing by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☐   (BY PERSONAL SERVICE) I caused to be delivered by hand to the addressee(s) noted above. I delivered to an authorized courier or driver to be delivered on the same date. A proof of service signed by the authorized courier will be filed with the court upon request.

☐ (BY OVERNIGHT DELIVERY)  I placed the sealed envelope(s) or package(s), to the addressee(s) noted above, designated by the express service carrier for collection and overnight delivery by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA.  I am readily familiar with WSGR's practice for collecting and processing of correspondence for overnight delivery, said practice being that, in the ordinary course of business, correspondence for overnight delivery is deposited with delivery fees paid or provided for at the carrier's express service offices for next-day delivery the same day as the correspondence is placed for collection.

☐ (BY FACSIMILE)  I caused to be transmitted by facsimile machine (number of sending facsimile machine is (858) 350-2399 at the time stated on the attached transmission report(s) by sending the document(s) to (see above).  The facsimile transmission(s) was reported as complete and without error.

☐ (BY ELECTRONIC MAIL)  I caused such document(s) to be sent via electronic mail (email) to the above listed names and email addresses and received confirmation indicating that this document(s) was successfully electronically transmitted to the parties named above.

☒ (BY CM/ECF)  I caused such document(s) to be sent via electronic mail through the Case Management/Electronic Case File system with the U.S. District Court for the Southern District of California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, and that this declaration was executed on February 28, 2007.

_Kris O'Connor_
Kris O'Connor

# APPENDIX "A"

*APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 5,928,883

Inventor(s): Gleich et al.
Assignee:  Mayo Foundation for Medical Education (Rochester, MN)
Issue Date:  July 27, 1999

1.  A **diagnostic method** comprising:

  **obtaining a physiological sample** of material from the gastrointestinal tract of a human suspected of affliction with, or afflicted with, an inflammatory bowel disorder; and

  **determining the level** of the eosinophil pro-inflammatory granule protein eosinophil peroxidase in said sample, **wherein the level is <u>correlated</u>** to the presence or absence of said **inflammatory bowel disorder**.

*APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,680,342

Inventor(s): **Young et al.**
Assignee: **Mayo Foundation for Medical Education and Research (Rochester, MN)**
Issue Date: **January 20, 2004**

1. A **method of treating** an individual with prostate cancer or at risk of developing prostate cancer, comprising the steps of:

    **identifying an individual** with prostate cancer or at risk of developing prostate cancer;

    **administering a dose** of quercetin to said individual effective to inhibit expression of a gene encoding an androgen receptor, wherein decreasing androgen receptor expression inhibits the proliferation of prostate cancer cells; and

    **monitoring** said individual **for a dose-dependent reduction in prostate-specific antigen (PSA) levels**, wherein said **dose-dependent reduction** in PSA <u>correlates</u> with a dose-dependent decrease in expression of said gene encoding said androgen receptor.

*APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,235,486

**Inventor(s):  Young et al.**
**Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN)**
**Issue Date:  May 22, 2001**


1. A method for **detecting or determining** breast cancer in a human, comprising:

   a) **contacting an amount of an antibody**, which binds to an hK2 polypeptide and which does not bind to an hK3 polypeptide, with the cells of a human tissue sample **so as to form a binary complex** comprising the antibody and the cells; and

   b) **determining or detecting** the presence or amount of complex formation in the sample and **correlating** the presence or amount of said complex to the presence or absence of breast cancer in said human.

## *APPENDIX A*
## <u>MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.</u>

### <u>U.S. Patent No. 6,475,723</u>

**Inventor(s): Hutton et al.**
**Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN);**
**Washington University (St. Louis, MO); Erasmus Universiteit Rotterdam (NL); The Victoria**
**University of Manchester (GB)**
**Issue Date:  November 5, 2002**

19. A method for **determining a diagnosis, prognosis or risk of a Tau pathology** in a patient, said method comprising **detecting a tau gene mutation in genomic DNA of said patien**t, wherein said mutation is in an exon of said tau gene or in a region 13-16 nucleotides 3' of the exon 10 splice donor site of said tau gene, wherein said mutation in said exon results in a deletion of amino acid 280, a threonine residue at amino acid 257, a valine residue at amino acid 272, a leucine residue or a serine residue at amino acid 301, an arginine residue at amino acid 389, or a tryptophan residue at amino acid 406 of a human Tau polypeptide, and **wherein said mutation is <u>associated</u> with said Tau pathology**.

### *APPENDIX A*
### MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,818,406

**Inventors: Goronzy et al.**
**Assignee: Mayo Foundation for Medical Education and Research (Rochester, MN)**
**Issue Date: November 16, 2004**

1. A method for **determining the severity of a rheumatoid arthritis** condition in a mammal, said method comprising **determining** whether or not a sample comprising synovial tissue or synovial fluid from said mammal **contains an elevated level of a CD21L polypeptide,** wherein **the presence of said elevated level indicates** that said rheumatoid arthritis condition is severe.

2. A method of **assisting a person in determining** the severity of a rheumatoid arthritis condition in a mammal, wherein said method comprises:
   a) **determining whether** or not a sample comprising synovial tissue or synovial fluid from said mammal **contains an elevated level of a CD21L polypeptide;** and
   b) **communicating information** about the presence or absence of said elevated level in said sample to said person, wherein **the presence of said elevated level indicates** that said rheumatoid arthritis condition is severe.

*APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,635,433

Inventor(s):  Goronzy et al.
Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN)
Issue Date:  October 21, 2003

1. A method for **classifying** an angina condition in a patient, said method comprising:

   a) **determining the frequency** of $CD4^+/CD28^{null}$ cells in said patient,

   b) **comparing** said frequency of $CD4^+/CD28^{null}$ cells to a reference frequency to obtain information about said angina condition, and

   c) **classifying said angina condition as stable or unstable based on said information.**

## *APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,316,188

Inventor(s):  Yan et al.
Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN)
Issue Date:  November 13, 2001

1. A method of **classifying a patient** diagnosed with asthma, said method comprising **determining** if said patient has a histamine-N-methyltransferase gene variant **associated** **with asthma**, wherein said histamine-N-methyltransferase gene variant comprises a thymine at nucleotide 314; and **classifying said patient as either having or lacking said histamine-N-methyltransferase gene variant associated with asthma.**

3. A method of **designing a treatment regimen** from a patient diagnosed with asthma, said method comprising classifying said patient by the method of claim 1, designing a treatment regimen for said patient **based, at least in part, on presence or absence** of said histamine-N-methyltransferase variant.

4. A method for **determining a diagnostic or risk estimate** of asthma in a patient comprising detecting the presence or absence of a histamine-N-methyltransferase gene variant in said patient, wherein said histamine-N-methyltransferase gene variant comprises a thymine at nucleotide 314, and **diagnosing or estimating risk of asthma based, at least in part, on presence or absence** of said variant in said patient, wherein the presence of said histamine-n-methyltransferase gene variant is diagnostic of or indicative of risk for asthma.

*APPENDIX A*
**MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.**

**U.S. Patent No. 6,962,776**

**Inventor(s): Kopecky et al.**
**Assignee: Mayo Foundation for Medical Education and Research (Rochester, MN)**
**Issue Date: November 8, 2005**

5. A method of assisting a person in **determining whether or not the cardiovascular system of a mammal has an unstable plaque**, said method comprising:

   a) **determining the level of a CD64 or IP-10 polypeptide** in a sample from the cardiovascular system of said mammal, and

   b) **communicating** information about said level to said person, wherein **an elevated level of said CD64 or IP-10 polypeptide in said sample <u>indicates</u> that said mammal contains said unstable plaque**.

6. The method of claim 5, said person is a medical professional.

7. The method of claim 6, wherein said medical professional is selected from the group consisting of a doctor, a nurse practitioner, a scientist, and a technician.

8. The method of claim 5, wherein said communication comprises sending said information directly to said person.

9. The method of claim 5, wherein said communication comprises sending said information indirectly to said person.

10. The method of claim 5, wherein said communication comprises making said information electronically available to said person.

### *APPENDIX A*
### MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 6,416,955

**Inventor(s):  Sherris et al.**
**Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN)**
**Issue Date:  July 9, 2002**

1. A **method for determining** whether or not a sinusitis condition in a patient is non-invasive fungus-induced rhinosinusitis, said method comprising:

   a)  providing a sample of nasal or paranasal mucus from said patient, and

   b)  examining said sample to **determine the presence or absence** of a concentration of major basic protein within mucus of said patient, wherein said major basic protein is in free form, wherein said concentration is greater than 45 ng per mL mucus of said patient, and wherein **said presence of said concentration <u>indicates</u> that said sinusitis condition is said non-invasive fungus-induced rhinosinusitis,** thereby distinguishing said non-invasive fungus-induced rhinosinusitis from other sinusitis conditions.

*APPENDIX A*
## MAYO PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.

### U.S. Patent No. 5,468,222

**Inventor(s):  Altchuler**
**Assignee:  Mayo Foundation for Medical Education and Research (Rochester, MN)**
**Issue Date:  November 21, 1995**

1. A method of **tapering a patient from a medicament**, comprising:

   a) **predetermining the initial dose** of said medicament as a first parameter;

   b) **predetermining at least one of the parameters** selected from the group consisting of an intermediate dose of said medicament, the final dose of said medicament, the duration of said taper, and the percent decrement between said initial dose and said final dose as a second parameter;

   c) **calculating** a tapering schedule in accordance with the algorithm
$$G(t) = Rnd[a, M]$$

   wherein $G(t)$ is the amount of said medicament given at time t, Rnd is a rounding function which rounds a to the nearest multiple of M; a is $K_1 k_2^t$, wherein $k_1$ is the initial dose of said medicament, $k_2$ is said second parameter, and t is time, and M is the minimum dosage size available;

   d) administering said medicament to said patient in a dosage amount in accordance with said calculated tapering schedule;

   e) **observing the clinical response of said patient to said administration;**

   f) **modifying said dosage amount if said response indicates that said dosage amount is too high or too low, until the response of said patient to said modified dosage amount is stable;**

   g) recalculating a tapering schedule in accordance with the algorithm in part (c) using as said first parameter said initial dose and as said second parameter said modified dosage amount; and,

   h) administering said medicament to said patient in a dosage amount **in accordance with said recalculated tapering schedule.**

- 10 -

# APPENDIX "B"

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS, ASSOCIATIONS, ETC.**

**U.S. Patent No. 6,693,130**

**Inventor(s):**   **Kroetz et al.**
**Assignee:**    **Regents of the University of California (Oakland, CA)**
**Issue Date:**   **February 17, 2004**

4. A method of **identifying a patient at increased risk** for hypertension, the method comprising **assaying for epoxide hydrolase activity in a urine sample** from the patient, wherein **a high level of epoxide hydrolase activity** <u>indicates</u> the patient is at increased risk for hypertension.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,312,663**

**Inventor(s):**   **Boykin**
**Assignee:**   **Not assigned on its face**
**Issue Date:**   **November 6, 2001**

1. A method of **determining** whether a diabetic subject is a wound healing diabetic or a non-wound healing diabetic, comprising the step of:

**comparing the level of a nitric oxide-related product** in a specimen from the diabetic subject with a threshold value which discriminates between wound healing and non-wound healing diabetics, wherein **if the level of the nitric oxide-related product is** above the threshold value **the subject is** a wound healing diabetic, and **if the level of the nitric oxide-related product is** approximately at or below the threshold value **the subject is** a non-wound healing diabetic.

20. A method of **treating a diabetic subject**, comprising the steps of:

**comparing** the level of a **nitric oxide-related product** in a specimen from the subject with a threshold value which discriminates between wound healing and non-wound healing diabetics, wherein **if the level of the nitric oxide-related product is** above the threshold value **the subject is** a wound healing diabetic, and **if the level of the nitric oxide-related product is** approximately at or below the threshold value **the subject is** a non-wound healing diabetic; and

**treating the subject according** to whether the subject is a wound healing diabetic or a non-wound healing diabetic.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,026,687

| | |
|---|---|
| **Inventor(s):** | **Yarchoan et al.** |
| **Assignee:** | **The United States of America as represented by the Department of Health (Washington, DC)** |
| **Issue Date:** | **June 25, 1991** |

10. A method of administering 2',3'-dideoxyinosine to a patient infected with HIV **in a manner to minimize pancreatitis** comprising administration of 2',3'-dideoxyinosine in a range of about 0.4 mg/kg/day to about 14 mg/kg/day wherein:

(1) the patient's **serum triglyceride levels and/or serum amylase levels are monitored**;

(2) the 2',3'-dideoxyinosine is **withheld when the serum triglyceride level exceeds about 500** mg/dl or the amylase levels rise to about 150% or more of the upper limit of normal levels; and

(3) administration of 2',3'-dideoxyinosine is **resumed** at a dose of about 0.4 mg/kg/day to about 9.6 mg/kg/day **after triglyceride or amylase levels return to about normal** or baseline levels.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,074,822**

| | |
|---|---|
| **Inventor(s):** | **Henry** |
| **Assignee:** | **Board of Trustees operating Michigan State University (East Lansing, MI)** |
| **Issue Date:** | **June 13, 2000** |

2. A method for the treatment of a diabetic patient having an abnormal aldose reductase RNA expression phenotype which comprises:

(a) **isolating cells from the patient** which are indicative of a risk of diabetic complications;

(b) **exposing the cells** isolated from the patient which can be indicative of the risk of diabetic complications **to glucose at pathophysiologic levels** which can occur commonly in diabetes;

(c) **determining a level of production of aldose reductase RNA** encoding the aldose reductase in the exposed cells, wherein **an elevated level of the RNA compared to the level of the RNA in cells not exposed to the glucose** at pathophysiologic levels **is indicative of the abnormal phenotype**; and

(d) treating the patient whose cells have the abnormal phenotype with an inhibitor of the aldose reductase.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,071,697**

**Inventor(s):**   **Sosa-Pineda et al.**
**Assignee:**       **Max-Planck Gesellschaft zur Forderung der Wissenschaften e.V. (Berlin, DE)**
**Issue Date:**     **June 6, 2000**

1. A method for **determining risk of developing juvenile diabetes** based upon absence of Pax4 mRNA or protein in a mammal comprising:

(a) **determining the level or status** of Pax4 mRNA in $\beta$-cells of said mammal; and/or

(b) determining the level or status of Pax4 protein in $\beta$ -cells of said mammal; and

(c) **comparing said level or status** or Pax4 mRNA and/or Pax4 protein with the corresponding level in normal $\beta$ -cells;

wherein the term "level" denotes the amount of mRNA or protein produced; and, the term "status" includes that the Pax4 gene, mRNA, protein or a transcription control element, including a promoter/enhancer sequence, may bear a mutation, deletion or any other modifications which would affect the overall activity of the gene when compared to the wild-type normal gene product, including post-translational modifications of the protein, and **from the comparing determining an absence of Pax4 mRNA or protein and thus risk of developing juvenile diabetes.**

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,866,547

**Inventor(s):**   **Flier et al.**
**Assignee:**      **Beth Israel Deaconess Medical Center (Boston, MA)**
**Issue Date:**    **February 2, 1999**

14. A method of **treating** an affective disorder in an individual comprising the steps of:

a) **determining the level** of hypothalamic pituitary adrenal axis activity in the individual;

b) **comparing the level** of hypothalamic pituitary adrenal axis activity determined in step a) with a control level; and

c) **administering** to the individual an effective amount of:

i) **leptin, leptin analog, biologically active leptin fragment** or leptin fusion protein **if the level** of hypothalamic pituitary adrenal axis activity determined in step a) **is higher than the control level**; **or**

ii) **leptin antagonist if the level** of hypothalamic pituitary adrenal axis activity determined in step a) **is lower than the control level**.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,322,982**

| | |
|---|---|
| **Inventor(s):** | **Shyjan et al.** |
| **Assignee:** | **Millennium Pharmaceuticals, Inc. (Cambridge, MA)** |
| **Issue Date:** | **November 27, 2001** |

1. A method for **determining** whether a patient is suffering from a carcinoma that has become increasingly drug-resistant comprising:

a) obtaining a first sample comprising carcinoma cells from the patient at a first time;

b) obtaining a second test sample comprising carcinoma cells from the patient at second time;

c) **measuring the expression of ubiquitin carboxy-terminal hydrolase** in the first and second samples; and

d) **determining that the patient is** suffering from a carcinoma that has become increasingly drug resistant **if the expression of ubiquitin carboxy-terminal hydrolase in the second sample is greater** than the expression of ubiquitin carboxy-terminal hydrolase in the first sample.

3. A method for **monitoring the efficacy** of a compound for inhibition of drug resistance of carcinoma in a patient, comprising

a) obtaining a first sample comprising carcinoma from the patient at a first time;

b) administering the compound to the patient;

c) obtaining a second sample comprising carcinoma from the patient at a second time; and

d) **determining the expression of ubiquitin carboxy-terminal hydrolase in the first and second samples**; and

e) **determining that the compound is effective to inhibit drug resistance** of carcinoma cells in the patient **when the level of expression of ubiquitin carboxy-terminal hydrolase is lower** in the second sample than in the first sample.

-7-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,322,982 (continued)

15. A method for **determining whether treatment with an anti-cancer agent should be continued** in a carcinoma patient, comprising:

a) obtaining two or more samples comprising carcinoma cells from the patient during the course of anti-cancer agent treatment;

b) **determining the level** of activity of ubiquitin carboxy-terminal hydrolase in the two or more samples; and

c) **continuing treatment when the activity level of ubiquitin carboxy-treatment hydrolase does not increase during the course of treatment.**

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,274,314

| | |
|---|---|
| **Inventor(s):** | **Moskal et al.** |
| **Assignee:** | **Nyxis NeuroTherapies, Inc. (Chicago, IL)** |
| **Issue Date:** | **August 14, 2001** |

1. A method **for determining the effectiveness of a treatment regimen** for cancer comprising **determining the concentration of the modified nucleoside 7-methylinosine in a test sample of bodily fluid** of a patient wherein **a decreased amount of the modified nucleoside** in the test sample relative to the amount of the modified nucleoside detected in a control sample of bodily fluid isolated from the patient prior to treatment **indicates** that **the treatment regimen is effective**.

***APPENDIX B***
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,268,142**

| | |
|---|---|
| **Inventor(s):** | **Duff et al.** |
| **Assignee:** | **Interleukin Genetics, Inc. (Waltham, MA)** |
| **Issue Date:** | **July 31, 2001** |

21. A method for **determining the effectiveness of treating a subject** that has or is predisposed to developing a disease or condition that is associated with an IL-1 allelic pattern, comprising at least two alleles selected from the group consisting of: allele 1 of +4845 IL-1A, allele 4 of 222/223 IL-1A allele, allele 4 of gz5/gz6 IL-1A, allele 1 of -889 IL-1A, allele 2 of -511 IL-1B, allele 3 of gaat.p33330, allele 3 of Y31, allele 2 of +2018 IL-1RN, allele 2 of 1731 IL-1RN allele, allele 2 of 1812 IL-1RN, allele 2 of 1868 IL-1RN, allele 2 of 1887 IL-1RN, allele 2 of 8006 IL-1RN, allele 2 of 8061 IL-1RN and allele 2 of 9589 IL-1RN, allele 2 of +4845 IL-1A, allele 3 of 222/223 IL-1A allele, allele 3 of gz5/gz6 IL-1A, allele 2 of -889 IL-1A, allele 1 of -511 IL-1B, allele 4 of gaat.p33330, allele 6 of Y31, and allele 1 of +2018 IL-1RN, with a particular dose of a particular therapeutic, comprising the steps of

a) **detecting the level**, amount or activity of an IL-1 protein or an IL-1 mRNA in a sample obtained from a subject;

b) **administering the particular dose of the particular therapeutic to the subject and detecting the level, amount or activity** of an IL-1 protein or an IL-1 mRNA in a sample obtained from a subject; and

c) **comparing** **the relative level, amount or activity obtained in step a) with the level, amount or activity obtained in step b), wherein an increase in the relative amount or activity** of the IL-1 protein or mRNA after administration of the therapeutic as compared to that before administration of the therapeutic **indicates** **that the particular dose of the particular therapeutic is effective** in treating the subject.

-10-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,583,002

| | |
|---|---|
| **Inventor(s):** | **Ochoa et al.** |
| **Assignee:** | **Regents of the University of Minnesota (Minneapolis, MN)** |
| | **The United States of America as represented by the Department of Health** |
| | **(Washington, DC)** |
| **Issue Date:** | **December 10, 1996** |

6. A method of **identifying a patient** having T lymphocytes capable of activation for immunotherapy, said method comprising the steps of:

a) **determining the level of subunit protein in CD3** of the TCR from a patient to be evaluated for immunotherapy;

b) **comparing said level** of said protein with the normal level of said protein characteristic of non-immunosuppressed individuals; and

c) **selecting a patient whose level of said protein is above a therapeutically effective threshold** in non-immunosuppressed individuals.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,764,831

**Inventor(s):**   Cameron et al.
**Assignee:**        Proteome Sciences, Inc. (Houston, TX)
**Issue Date:**      July 20, 2004

6. A method of **diagnosing** the extent of activation of the pain sensing neurological pathway in a patient comprising: i) **determining the amount** of a cholinesterase pain marker in a biological sample obtained from said patient; ii) **comparing the amount** of the cholinesterase pain marker in said sample **to a threshold amount** of cholinesterase pain marker; and iii) **assigning a pain status to the patient based upon the comparison,** wherein **the threshold amount of cholinesterase pain marker is determined by measuring the amount of cholinesterase in samples from patients in whom the pain sensing neurological pathway is not activated** and setting the threshold so that the threshold amount of cholinesterase pain marker is at least three standard deviations above the mean cholinesterase amount in samples from normal individuals.

21. A method for **determining the efficacy** of a treatment for pain comprising: i) **determining the amount of a pain marker in a first** biological sample obtained from said patient; ii) **administering the treatment to said patient;** iii) **determining the amount of a pain marker in a second** biological sample obtained from said treated patient; and iv) **comparing the amount** of the pain marker **in the first and second** biological samples.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No 6,607,894**

**Inventor(s):**  **Lopata et al.**
**Assignee:**    **Not assigned on its face**
**Issue Date:**  **August 19, 2003**

1. A method of **detecting the presence of endometrial cancer** in a subject at risk of, or suspected to be suffering from, endometrial cancer, comprising the steps of obtaining a sample of uterine fluid from the uterine cavity of the subject, and **measuring the levels or activity of matrix metalloproteinase-2** (MMP-2) and/or matrix metalloproteinase-9 (MMP-9) in the uterine fluid, **wherein an elevated level or activity of MMP-2** and/or MMP-9 in the fluid from the subject as **compared** to a control **indicates** that endometrial cancer is present in the subject, thereby detecting the presence of endometrial cancer.

26. A method of **monitoring the efficacy** of a putative treatment for endometrial cancer in a patient, comprising the steps of obtaining a sample of uterine fluid from the uterine cavity of the patient before and after the patient has received the putative treatment, **measuring the levels or activity of MMP-2** and/or MMP-9 in fluid, **wherein lowered levels or activities of MMP-2** and/or MMP-9 in the sample taken after treatment relative to the sample taken before treatment **indicates that the putative treatment is succeeding**, thereby monitoring the efficacy of the putative treatment for endometrial cancer.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No 6,811,993

| | |
|---|---|
| **Inventor(s):** | **King** |
| **Assignee:** | **Joslin Diabetes Center, Inc. (Boston, MA)** |
| **Issue Date:** | **November 2, 2004** |

1. A method of **evaluating a subject** for the extent, stage, or severity, of a cardiovascular complication of diabetes, the method comprising: **determining the level of PKC activity** in monocytes of the subject; optionally comparing the level of the PKC activity in monocytes of the subject with a standard, and **correlating** **the level of PKC activity** with the extent, stage, or severity, of the cardiovascular complication of diabetes.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No 6,365,593**

**Inventor(s):**   **Rusche et al.**
**Assignee:**   **Repligen Corporation (Needham, MA)**
**Issue Date:**   **April 2, 2002**

1. A method of diagnosing an individual for an autistic disorder, the method comprising

**obtaining a sample of urine** from the individual;

**measuring a level of a methylxanthine** (MX) in the urine sample; and

**comparing the level to a normal control** or to a threshold level;

wherein **a level below the normal control** or below a threshold level of about 5.3 micrograms of methylxanthine/ml of urine **indicates a possibility of autistic disorder**.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No 6,753,135**

Inventor(s):   **Alters et al.**
Assignee:       **SurroMed, Inc. (Menlo Park, CA)**
Issue Date:    **June 22, 2004**

1. A method for **determining whether a glucocorticoid drug is effective** in treating a atopy or asthma, comprising: **administering said candidate drug to a subject**; obtaining a biological sample from said subject; **measuring values of a set of factors in said sample**, wherein said set of factors comprises at least two factors selected from the group consisting of: CD89 expression on granulocytes, CD38 expression on CD4 T cells, HLA-DP, HLA-DQ, HLA-DR, and HLA-PAN expression on B cells, CD62L expression on B cells, monocyte count, HLA-DP, HLA-DQ, HLA-DR, and HLA-PAN expression on monocytes, MMP-3 concentration, and SAA concentration; and **comparing said measured values with standard values**.

10. A method for **detecting a systemic effect of a glucocorticoid drug** in a subject, comprising: obtaining a biological sample from said subject, wherein **said sample is correlated with systemic activity; measuring values of a set of factors in said sample**, wherein said set comprises at least one factor selected from the group consisting of: CD89 expression on granulocytes, CD38 expression on CD4 T cells, HLA-DP, HLA-DQ, HLA-DR, and HLA-PAN expression on B cells, CD62L expression on B cells, monocyte count, HLA-DP, HLA-DQ, HLA-DR, and HLA-PAN expression on monocytes, MMP-3 concentration, and SAA concentration; and **comparing said measured values** with standard values.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

<u>U.S. Patent No 6,130,035</u>

| | |
|---|---|
| **Inventor(s):** | **Brusilow** |
| **Assignee:** | **Brusilow Enterprise LLC (Baltimore, MD)** |
| **Issue Date:** | **October 10, 2000** |

1. A method of **screening for the presence or absence of cancer** characterized by increased DNA synthesis in a patient, the method comprising

> **administering to the patient** an orotidine monophosphate decarboxylase inhibitor precursor;

> thereafter **collecting a body fluid sample** from the patient; and

> **determining the orotate or orotidine content** in the sample relative to a standard or control **to <u>correlate</u> the content** with the presence or absence of cancer in the patient.

11. A method of **monitoring the effectiveness of treatment** of cancer characterized by increased DNA synthesis in a patient, the method comprising
   a) **administering to the patient** an orotidine monophosphate decarboxylase inhibitor precursor;
   b) thereafter collecting a body fluid sample from the patient;
   c) **determining a first** orotate or orotidine content in the sample;
   d) thereafter treating the cancer with a cancer treatment;
   e) repeating steps (a)-(c) to **determine a second** orotate or orotidine content in the sample; and
   f) <u>comparing</u> **the first content with the second content to monitor the effectiveness** of the cancer treatment.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No 5,694,950**

| | |
|---|---|
| **Inventor(s):** | **McMichael** |
| **Assignee:** | **J & W McMichael Software, Inc. (Wexford, PA)** |
| **Issue Date:** | **December 9, 1997** |

32. A method for **treating a patient** to prevent an adverse immune response by partially suppressing the patient's immune system without unduly suppressing the ability of the system to combat infection, comprising the steps of:

(a) **administering an initial dose** of Cyclosporin to the patient;

(b) **examining the patient to determine a current Cyclosporin whole blood level** for the patient;

(c) **determining a desired Cyclosporin level for the patient;**

(d) **employing the following relationship along with the patient's current Cyclosporin dosage,** the patient's current Cyclosporin whole blood level, and a potential next Cyclosporin dosage to determine a next Cyclosporin dosage:

wherein,

ND=the patient's next Cyclosporin dosage,

CD=the patient's current Cyclosporin dosage,

CL=the patient's current Cyclosporin whole blood level, and

DL=the desired Cyclosporin level for the patient,

RD=the patient's previous Cyclosporin whole blood level

e=CL-RD

d=DL-RD

(e) **administering a next dose of Cyclosporin to the patient in accordance** with the next Cyclosporin dosage **determined from the relationship**.

-18-

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No 5,624,912**

**Inventor(s):**   **Burcoglu et al.**
**Assignee:**      **Not assigned on its face**
**Issue Date:**    **April 29, 1997**

4. A method of **treating an HIV infection in a patient** comprising the following steps:

a) **determining the initial state** of a set of disease markers associated with an HIV infection, the disease markers being characteristics of the patient which deviate from an uninfected individual due to HIV infection, wherein each disease marker in the set has a predetermined reference range indicative of an uninfected condition,

b) **administering intravenously to the patient a dose** of defibrotide between 40 mg/kg patient body weight per day to 400 mg/kg patient body weight per day,

c) **screening a panel of second messengers** and signal transducers, and selecting one or more of these as repair markers, where, **as an indication of treatment efficacy,** the concentration of the selected repair marker or repair markers deviates away from the concentration found in an uninfected individual following administration of defibrotide,

d) **administering defibrotide at a higher dose than the dose in** b) and screening as in c),

e) repeating step d) each time the concentration of the repair marker or repair markers selected in c) deviates further away from the concentration found in an uninfected individual following administration of a higher dose of defibrotide,

f) **repeating steps d) and e) until the concentration of repair marker or repair markers selected in c) no longer deviates** further away from the concentration found in an uninfected individual,

g) **continuing the administration of defibrotide at the highest dose in f) until the concentration of repair marker or repair markers selected in c) returns** to the concentration found in an uninfected individual,

h) **administering** defibrotide at a dosage higher than g) and repeating the steps of c), d), e), f) and g), screening for one or more additional repair markers until all disease markers determined in a) no longer deviate from that found in an uninfected individual,

i) **administering** defibrotide at a dosage higher than h) and repeating the steps of c), d), e), f) and g), until the universal marker, vWAg, returns to the concentration found in an uninfected individual.

-19-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,710,007

Inventor(s):   **Luderer et al.**
Assignee:      **Not assigned on its face**
Issue Date:    **January 20, 1998**

1. A method for **diagnosing** prostatic adenocarcinoma (CAP) in a male human patient without requiring a prostate biopsy comprising:

a) **measuring the total prostate specific antigen** (PSA) level in the blood or serum of the patient;

b) **measuring the free PSA level in the blood** or serum of a patient only if he has a total PSA level of between 2.5 ng/ml and 20.0 ng/ml;

c) **calculating** the proportion of free PSA to total PSA; and

d) **diagnosing the patient as having CAP if the calculated proportion of free PSA to total PSA is less than about 7%.**

-20-

*APPENDIX B*

**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

<u>U.S. Patent No. 5,840,501</u>

| | |
|---|---|
| **Inventor(s):** | **Allard et al.** |
| **Assignee:** | **Bayer Corp. (Tarrytown, NY)** |
| **Issue Date:** | **November 24, 1998** |

**10.** A method for **monitoring the course of disease** in a male patient diagnosed with prostate cancer, comprising the performance of a series of immunoassays over time to **determine changes in the level of complexed prostate specific antigen (cPSA) in blood** samples obtained from such patient, whereby changes in the cPSA blood level <u>**correlate**</u> with changes in disease status.

11. A method for **monitoring** the course of disease in a patient who has been treated for prostate cancer, comprising the performance of a series of immunoassays over time to **determine changes in the level of complexed prostate specific antigen (cPSA) in blood** samples obtained from such patient, whereby increases in blood cPSA levels <u>**indicate** recurrence of disease</u>.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,501,983

| | |
|---|---|
| **Inventor(s):** | **Lilja et al.** |
| **Assignee:** | **Not assigned on its face** |
| **Issue Date:** | **March 26, 1996** |

15. A method for differentiation between benign prostatic hyperplasia and prostate cancer by **determining the ratio** between free PSA: immunologically recognized total PSA **in a patient's serum**.

16. A method for screening prostate cancer by **determining the ratio** between free PSA: immunologically recognized total PSA **in a patient's serum**.

17. A method for differentiation between benign prostatic hyperplasia and prostate cancer by **determining the ratio** between free PSA:PSA complexed with $\alpha_1$-antichymotrypsin **in a patient's serum**.

18. A method for screening prostate cancer by **determining the ratio** between free PSA:PSA complexed with $\alpha_1$-antichymotrypsin **in a patient's serum**.

19. A method for differentiation between benign prostatic hyperplasia and prostate cancer by **determining the ratio** between PSA complexed with $\alpha_1$-antichymotrypsin: immunologically recognized total PSA **in a patient's serum**.

20. A method for screening prostate cancer by **determining the ratio** between PSA complexed with $\alpha_1$-antichymotrypsin: immunologically recognized total PSA **in a patient's serum**.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS


### U.S. Patent No. 5,506,106


**Inventor(s):**   **Croce et al.**
**Assignee:**      **Thomas Jefferson University (Philadelphia, PA)**
**Issue Date:**    **April 9, 1996**


1.  A method of **detecting prostate specific antigen positive cells** in a patient having stage D1, D2, or D3 prostate cancer comprising: obtaining a sample of RNA from a patient's peripheral venous blood; reverse transcribing said RNA into DNA;

    **amplifying said DNA** with polymerase chain reaction using a pair of primers which are complementary to separate regions of the prostate specific antigen gene which do not hybridize to human glandular kallikrein gene; and

    **detecting the presence or absence of amplified DNA** wherein the presence of amplified DNA **indicates** the presence of prostate specific antigen positive cells in said patient.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,085,983

**Inventor(s):** **Scanlon**
**Assignee:** **City of Hope (Duarte, CA)**
**Issue Date:** **February 4, 1992**

1. A method for **determining the presence or absence of cancer** in a human patient which comprises:

   (i) **selecting a human gene** from the group consisting of the dihydrofolate reductase gene, the DNA polymerase beta gene, the dTMP synthase gene, the c-fos gene, the c-myc gene and the H-ras gene, the transcripts of which, if said patient has cancer, contain a DNA marker having a target DNA sequence which is not present in the transcripts from the same gene if said patient does not have cancer;

   (ii) **analyzing the transcripts** of said gene to determine the presence or absence of said DNA marker, said analysis comprising a determination of whether or not a probe complementary to said target sequence, when said patient has cancer, will hybridize to said target sequence.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 5,543,296**

**Inventor(s):**   **Sobol et al.**
**Assignee:**      **Hoffman-La Roche (Nutley, NJ); Regents of the University of California**
                   **(Oakland, CA)**
**Issue Date:**    **August 6, 1996**

1.  A method for **detecting metastasis** of a prostate carcinoma, wherein said method comprises:

    (a) **treating a sample of non-prostate body tissue** or fluid under conditions for **amplifying a target mRNA sequence**, wherein said target mRNA sequence is a region of the gene encoding prostate specific antigen (PSA), and wherein said target mRNA sequence is not normally expressed in said non-prostate tissue or fluid; and

    (b) **determining if amplification of said target mRNA sequence has occurred, which indicates metastasis of a prostate carcinoma**.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,688,649

Inventor(s):   **Croce et al.**
Assignee:      **Thomas Jefferson University (Philadelphia, PA)**
Issue Date:    **November 18, 1997**

1.  A method of **detecting prostate cancer** micrometastasis in a patient comprising the steps of:

    **obtaining a sample of blood** of the patient;

    **obtaining a sample of RNA** from the blood sample wherein said RNA is obtained from cells from the buffy coat of the Ficoll gradient of a prepared blood sample;

    **detecting the presence of RNA that encodes prostate specific antigen** in said sample of RNA; wherein said presence of RNA that encodes prostate specific antigen **indicates** circulating hematogenous micrometastasis of prostate cancer.

-26-

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 5,698,402**

**Inventor(s):** **Luderer, et al.**
**Assignee:** **Diannon Systems Inc. (Stratford, CT)**
**Issue Date:** **December 16, 1997**

1. A method for **diagnosing benign prostatic hyperplasia** (BPH) in a male human patient under 60 years old without requiring a prostate biopsy comprising:

   a) **measuring** the total prostate specific antigen (PSA) level in the blood or serum of the patient;

   b) **measuring** the free PSA level in the blood or serum of a patient only if said patient has a total PSA level of between 2.5 ng/ml and 10.0 ng/ml;

   c) **calculating** the proportion of free PSA to total PSA; and

   d) **diagnosing the patient as having BPH if the calculated proportion of free PSA to total PSA is equal to or greater than about 25%.**

2. . A method for **diagnosing benign prostatic hyperplasia** (BPH) in a male human patient at least 60 years old without requiring a prostate biopsy comprising:

   a) **measuring** the total prostate specific antigen (PSA) level in the blood or serum of the patient;

   b) **measuring** the free PSA level in the blood or serum of a patient only if said patient has a total PSA level of between 4.0 ng/ml and 10.0 ng/ml;

   c) **calculating** the proportion of free PSA to total PSA; and

   d) **diagnosing the patient as having BPH if the calculated proportion of free PSA to total PSA is equal to or greater than about 25%.**

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 5,753,437**

| | |
|---|---|
| **Inventor(s):** | **Steeg, et al.** |
| **Assignee:** | **The United States of America as represented by the Department of Health & Human Services (Washington, DC)** |
| **Issue Date:** | **May 19, 1998** |

1.  A method of **diagnosing metastatic potential of carcinoma** in a human subject who has been identified as having previously had or currently having a carcinoma selected from the group consisting of breast carcinoma, non-small cell lung carcinoma, and kidney carcinoma, said metastatic potential being due to allelic deletions in the human nm23 gene, nm23-H1, said method comprising the steps of:

    (a) **obtaining a sample of chromosomal DNA** from the tumor of a human subject having been identified as having previously had or currently having a tumor said tumor due to a carcinoma selected from the group consisting of breast carcinoma, non-small cell lung carcinoma and kidney carcinoma; and

    (b) **analyzing said sample of chromosomal DNA** for the presence or absence of a human nm23-H1 allele said **absence of a human nm23-H1 allele being <u>indicative</u> of metastatic potential**.

2.  A method of **diagnosing metastatic potential of colorectal carcinoma** in a human subject who has been identified as having previously had or currently having colorectal carcinoma, said metastatic potential being due to homozygous deletions in the human nm23 gene, nm23-H1, said method comprising the steps of:

    (a) **obtaining a sample of chromosomal DNA** from the tumor of a human subject having been identified as having previously had or currently having had a tumor due to colorectal carcinoma; and

    (b) **analyzing said sample of chromosomal DNA** for the presence or homozygous deletion of human nm23-H1 said **homozygous deletion of human nm23-H1 being <u>indicative</u> of metastatic potential**.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,753,437 (continued)

3.   A method of **diagnosing metastatic potential of neuroblastoma** in a human subject who has been identified as having previously had or currently having neuroblastoma, said metastatic potential being due to amplification of the human nm23 gene, nm23-H1, the method comprising the steps of:

(a) **obtaining a sample of DNA** from a tumor of a human subject having been identified as having previously had or currently having a tumor due to neuroblastoma; and

(b) **analyzing said sample of DNA** for amplification of an nm23-H1 allele, said **amplification of an nm23-H1 allele being <u>indicative</u> of metastatic potential**.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,747,264

Inventor(s):  **Schmidt et al.**
Assignee:     **SmithKline Beechum Corporation (King of Prussia, PA)**
Issue Date:   **May 5, 1998**

1.  A **diagnostic and monitoring** method for prostate cancer comprising:

    **measuring the level of Type II phospholipase $A_2$ ($PLA_2$) polypeptide in cells tissues and bodily fluids** of an individual, wherein Type II $PLA_2$ polypeptide **level higher than three standard deviations above normal control is** <u>associated</u> **with the presence of prostate cancer.**

2.  A **diagnostic** method for discriminating between an individual having prostate cancer and an individual having normal prostate comprising:

    **measuring the level of Type II $PLA_2$ polypeptide in cells, tissues and bodily fluids** of an individual, wherein Type II $PLA_2$ polypeptide **level higher than three standard deviations above normal control is** <u>associated</u> **with the presence of prostate cancer**.

3.  A **diagnostic** method for discriminating between prostate cancer and benign prostate hyperplasia (BPH) comprising:

    **measuring the level of Type II $PLA_2$ polypeptide in cells, tissues and bodily fluids** of an individual, wherein Type II $PLA_2$ polypeptide **level is higher than three standard deviations above normal control is** <u>associated</u> **with the presence of prostate cancer**.

4.  A method of claim 1, 2, or 3 in which the diagnostic process involves ELISA.

5.  A method of claim 1, 2, or 3 wherein the level of Type II $PLA_2$ polypeptide is measured by immunohistochemistry on cells and tissues.

-30-

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 5,605,804**

**Inventor(s):**  **Allard et al.**
**Assignee:**      **Bayer Corporation (Tarrytown, NY)**
**Issue Date:**    **February 25, 1997**

1. A method for **monitoring the course of disease** in a patient diagnosed with lung cancer, comprising the **performance of a series of specific immunoassays** over time to determine changes in the level of NCA 50/90 in blood samples obtained from such patient, whereby **changes in the NCA 50/90 blood level** underline correlate with changes in disease status.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,090,566**

Inventor(s):   **Vogelstein et al.**
Assignee:     **Johns Hopkins University (Baltimore, MD)**
Issue Date:   **July 18, 2000**

1. A method to aid in **determining neoplasia of a tissue** of a human, comprising:

    **comparing** p53 proteins in a human tissue suspected of being neoplastic to wild-type p53 proteins having 393 amino acids, said wild-type p53 proteins being defined by their presence in normal human tissues;

    **detecting an alteration** in the amino acid sequence between p53 proteins in the human tissue suspected of being neoplastic and wild-type p53, wherein the alteration is due to a mutation in a p53 gene in the human tissue, said mutation selected from the group consisting of: a point, deletion, missense, and frameshift mutation, **wherein an alteration in the amino acid sequence <u>indicates</u> neoplasia of the tissue.**

5. A method to aid in **determining neoplasia** of a tissue of a human, comprising:

    **testing p53 proteins in a human tissue** suspected of being neoplastic and wild-type p53 proteins having 393 amino acids, said wild-type p53 proteins being defined by their presence in normal human tissues, for the ability to complex with an antigen selected from the group consisting of SV-40 large T antigen and adenovirus E1B antigen, **wherein p53 proteins in the human tissue which have a diminished ability to complex with the antigen compared to the wild-type p53 proteins <u>indicate</u> neoplasia.**

7. A method to aid in **determining neoplasia** of a tissue of a human, comprising:

    **comparing** (a) p53 proteins in a human **tissue** suspected of being neoplastic to (b) wild-type p53 proteins in a normal tissue of said human;

    detecting an alteration in the amino acid sequence between the p53 proteins, wherein the alteration is due to a mutation in a p53 gene in the human tissue suspected of being neoplastic, wherein the mutation is selected from the group consisting of: a point, deletion, missense, and frameshift mutation, **wherein an alteration in the amino acid sequence <u>indicates</u> neoplasia.**

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 6,090,566 (continued)**

10. A method to aid in **determining neoplasia** of a tissue of a human, comprising:

**comparing** binding of a monoclonal antibody to (a) p53 proteins in a human tissue suspected of being neoplastic and to (b) wild-type p53 proteins having 393 amino acids, said wild-type p53 proteins being defined by their presence in normal human tissues, wherein the monoclonal antibody specifically binds to p53;

**detecting** loss of the binding of the antibody to (a) relative to (b), **wherein such loss of binding suggests neoplasia of the tissue**.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 4,968,603

**Inventor(s):**   **Slamon et al**
**Assignee:**       **The Regents of the University of California (Berkeley, CA)**
**Issue Date:**     **November 6, 1990**

1. A method for **screening patients** to determine disease status, said method comprising:

> **measuring** the level of amplification or expression of the HER-2/neu gene in a sample from a patient suffering from breast or ovarian adenocarcinoma; and

> **classifying** those patients having an increased level of amplification or expression of the HER-2/neu gene relative to a reference level characteristic of normal cells as being **more likely to suffer disease relapse or having a decreased chance of survival**.

7. A method for **determining a prognosis** in patients suffering from breast or ovarian adenocarcinoma, said method comprising:

> **determining the number of copies** of the HER-2/neu gene in cells from a sample from a patient suffering from breast or ovarian adenocarcinoma; and

> **classifying** patients having only a single copy of the HER-2/neu gene as being less likely to suffer disease relapse than those patients having two or more copies of the HER-2-neu gene.

17. A method for **determining the proper course of treatment** for patients suffering from breast or ovarian adenocarcinoma, said method comprising:

> **determining the number of copies** of the HER-2/neu gene in cells from a sample from a patient suffering from breast or ovarian adenocarcinoma;

> **identifying patients** having at least two copies of the HER-2/neu gene in the cells, which patients may require treatment proper for patients having a **lesser chance of survival** or decreased time to relapse; and

> **identifying patients** having only a single copy of the HER-2/neu gene in the cells, which patients may require treatment proper for patients having a **greater chance of survival** and being less likely to suffer disease relapse.

### *APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,083,698

Inventor(s):   **Olson, et al.**
Assignee:      **Oncormed, Inc. (Gaithersburg, MD)**
Issue Date:    **July 4, 2000**

78. A method of **detecting a predisposition** or higher susceptibility to cancer in an individual, comprising;

a) **digesting DNA** from said individual with a restriction endonuclease;

b) **separating DNA** fragments obtained from said digestion;

c) **hybridizing a DNA** fragment with an allele specific oligonucleotide having a nucleotide sequence capable of hybridizing to and identifying a sequence variation at nucleotide position 421-2, 815, 926, 1506, 2034, 2428, 4643, 5053, 5210, 5396+40, 5150, 3904, 903 or 4164 of the BRCA1 gene sequence or its complementary gene sequence,

d) <u>correlating</u> the presence or absence of said sequence variation with the respective presence or absence of the BRCA1 gene, thereby determining a predisposition or higher susceptibility to cancer.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,051,379

| | |
|---|---|
| **Inventor(s):** | **Lescallett, et al.** |
| **Assignee:** | **Oncormed, Inc., (Gaithersburg, MD)** |
| **Issue Date:** | **April 18, 2000** |

32. A method of **detecting a predisposition** or higher susceptibility to cancer in an individual, comprising:

a) **digesting** DNA from an individual to obtain DNA fragments;

b) **separating** said DNA fragments;

c) **detecting** a DNA fragment containing nucleotide number 2192, 3772, 5193, 5374, 6495 or 6909 of the BRCA2 gene sequence or a sequence variation at nucleotide number 2192, 3772, 5193, 5374, 6495 or 6909 of the BRCA2 gene sequence by sequencing;

d) **comparing** the sequence of said fragment with the BRCA2 gene sequence to determine the presence or absence of a sequence variation at nucleotide number 2192, 3772, 5193, 5374, 6495 or 6909, wherein the presence of a sequence variation indicates a predisposition or higher susceptibility to cancer.

-36-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,135,864

**Inventor(s):**  **Montagnier et al.**
**Assignee:**  **Institut Pasteur (Paris Cedex, FR); The United States of America as represented by the Secretary of the Department of Health and Human Services (Washington, DC)**
**Issue Date:**  **August 4, 1992**

29. An in vitro diagnostic method for the **detection of the quantity of the presence or absence of antibodies** which bind to antigens of a human retrovirus indicative of Acquired Immune Deficiency Syndrome (AIDS) or of Lymphadenopathy-Associated Syndrome (pre-AIDS), wherein said method comprises

> **contacting** a lysate enriched in p25 protein of said retrovirus with a biological fluid for a time and under conditions sufficient for said p25 protein and antibodies in the biological fluid to form antigen-antibody complexes; and

> **detecting the formation** of said complexes.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**


**U.S. Patent No. 4,708,818**


**Inventor(s):**  **Montagnier et al.**
**Assignee:**   **Insitut Pasteur (Paris, FR); The United States of America as represented by the**
        **Department of Health and Human Services (Washington, DC)**
**Issue Date:**  **November 24, 1987**


1. An in vitro diagnostic method for the **detection of the presence or absence of antibodies** which bind to antigens of a human retrovirus indicative of acquired immune deficiency syndrome (AIDS) or of lymphadenopathy-associated syndrome (pre-AIDS), which method comprises **contacting** a lysate of said human retrovirus comprising antigens of said retrovirus with a biological fluid for a time and under conditions sufficient for the retroviral antigens in the lysate and antibodies in the biological fluid to form antigen-antibody complexes and **detecting the formation** of the complexes.

2. The method of claim 1 wherein the detecting step further comprises **measuring the formation** of said antigen-antibody complexes.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,503,705

**Inventor(s):**   **Kozal, et al.**
**Assignee:**      **Leland Stanford Junior University (Palo Alto, CA)**
**Issue Date:**    **January 7, 2003**

1. A method of **evaluating the effectiveness** of anti-HIV therapy of an HIV-infected patient comprising:

    a)  **collecting** statistically significant data useful for determining whether or not a decline in plasma HIV RNA copy numbers exists after initiating treatment of an HIV-infected patient with an antiretroviral agent by:

        (i) **collecting** more than one plasma sample from the HIV-infected patient at time intervals sufficient to ascertain the existence of a statistically significant decline in plasma HIV RNA copy numbers;

        (ii) **amplifying** the HIV-encoding nucleic acid in the plasma samples using HIV primers via PCR for about 30 cycles;

        (iii) **measuring** HIV RNA copy numbers using the products of the PCR of step (ii);

        (iv) **comparing** the HIV RNA copy numbers in the plasma samples collected during the treatment; and

    b)  **evaluating** whether a statistically significant decline in plasma HIV RNA copy numbers exists in evaluating the effectiveness of anti-HIV therapy of a patient.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,968,730

Inventor(s):   **Merigan, et al.**
Assignee:      **Leland Stanford Junior University (Palo Alto, CA)**
Issue Date:    **October 19, 1999**

1. A method of **evaluating the effectiveness** of anti-HIV therapy of a patient comprising:

(i) **collecting** a plasma sample from an HIV-infected patient who is being treated with an antiretroviral agent;

(ii) **amplifying** the HIV-encoding nucleic acid in the plasma sample using HIV primers in about 30 cycles of PCR; and

(iii) **testing** for the presence of HIV-encoding nucleic acid, in the product of the PCR;

in which the absence of detectable HIV-encoding nucleic acid **correlates** positively with the conclusion that the antiretroviral agent is therapeutically effective.

9. A method of **evaluating the effectiveness** of anti-HIV therapy of a patient comprising

(i) **collecting** a plasma sample from an HIV-infected patient who is being treated with an antiretroviral agent;

(ii) **amplifying** the HIV-encoding nucleic acid in the plasma sample using HIV primers in about 30 cycles of PCR; and

(iii) **measuring** the HIV RNA copy number using the product of the PCR, in which an HIV RNA copy number greater than about 500 per 200 ul of plasma **correlates** positively with the conclusion that the antiretroviral agent is therapeutically ineffective.

### APPENDIX B
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS


### U.S. Patent No. 5,968,730 (continued)

19. A method of **evaluating the effectiveness** of anti-HIV therapy of a patient comprising

(i) **collecting** one pre-treatment plasma sample from an HIV-infected patient who is about to be treated with an antiretroviral agent;

(ii) **collecting** a post-treatment plasma sample from the HIV-infected patient after the patient has been treated with the antiretroviral agent;

(iii) **amplifying** the HIV-encoding nucleic acid in the pre-treatment and post-treatment plasma samples using HIV primers in about 30 cycles of PCR;

(iv) **measuring** the HIV RNA copy number using the products of the PCRs of step (iii); and

(v) **comparing** the HIV RNA copy number in pre-treatment and post-treatment plasma samples,

in which a ratio of HIV RNA copy number in pre-treatment and post-treatment plasma samples of greater than about 4 to 1 **correlates** positively with the conclusion that the anti-HIV agent is therapeutically effective.

*APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 4,666,829

| | |
|---|---|
| **Inventor(s):** | **Glenner, et al.** |
| **Assignee:** | **University of California (Berkeley, CA)** |
| **Issue Date:** | **May 19, 1987** |

9. A diagnostic method for **determining the presence of Alzheimer's Disease** in a human patient by detecting the presence of Alzheimer's Amyloid Polypeptide in the patient through an immunoassay, comprising the steps of:

   a)  **combining a sample of the human patient's body fluid** suspected of containing Alzheimer's Amyloid Polypeptide **with antibodies** specific to Alzheimer's Amyloid Polypeptide, having the following amino acid sequence:

$$H_2N\text{-}ASP\text{-}ALA\text{-}GLU\text{-}PHE\text{-}ARG\text{-}HIS\text{-}ASP\text{-}$$
$$\text{-}SER\text{-}GLY\text{-}TYR\text{-}GLN\text{-}VAL\text{-}HIS\text{-}HIS\text{-}GLN\text{-}$$
$$\text{-}LYS\text{-}LEU\text{-}VAL\text{-}PHE\text{-}PHE\text{-}ALA\text{-}GLU\text{-}ASP\text{-}$$
$$\text{-}VAL\text{-}GLY\text{-}SER\text{-}ASN\text{-}LYS\text{-}COOH;$$

   b)  monitoring the combination of step (a) to determine whether said antibodies have bound to said Alzheimer's Amyloid Polypeptide in an immunological reaction, thereby **indicating that said patient has Alzheimer's Disease**.

*APPENDIX B*

<u>**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**</u>

<u>**U.S. Patent No. 4,701,407**</u>

**Inventor(s):**  **Appel**
**Assignee:**     **Baylor College of Medicine (Houston, TX)**
**Issue Date:**   **October 20, 1987**

1. A method to **diagnose the presence of Alzheimer's Disease** in a subject by detecting a deficiency of a specific neurotrophic activity in said subject as compared to normal controls, wherein said deficiency is detected by the method which comprises:

> **extracting the proteins from the hippocampal tissue** of said subject;

> **assaying** said extract for neurotrophic activity with respect to the neuronal system normally associated with said hippocampal tissue; and

> **comparing** said neurotrophic activity to activity exhibited in the same assay by similar extracts from hippocampel tissue of controls.

### *APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 4,727,041

| | |
|---|---|
| **Inventor(s):** | **Aroonsakul** |
| **Assignee:** | **Not assigned on its face** |
| **Issue Date:** | **February 23, 1988** |

1. A method of **diagnosing Alzheimer's disease** in human beings comprising the steps of;

    a) subjecting a patient suspected of suffering from Alzheimer's disease to a **somatotropin secretion-stimulation test**;

    b) **determining the levels** of somatotropin in at least one blood serum sample taken from the patient after the somatotropin secretion-stimulation test; and

    c) <u>comparing</u> the levels of somatotropin from the at least one blood serum sample, obtained during said step (b) with the levels of somatotropin found in normal subjects within the patient's age group to determine if any increases of somatotropin caused by said step (a) statistically-match the increases thereof found in normal subjects.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,109,868

**Inventor(s):**   **Smith, et al.**
**Assignee:**   **E.R. Squibb & Sons, Inc. (Princeton, NJ)**
**Issue Date:**   **May 5, 1992**

1. A method for **detecting senile dementia of the Alzheimer's type** (SDAT), which comprises **measuring the thickness of one or both medial temporal lobes** of the brain of a patient, and **determining** if the thickness of one or both medial temporal lobes is at least about 25% below the average thickness of the medial temporal lobe of a significant number of normal non-demented controls, **thereby signifying presence of SDAT in such patient,** or determining if the thickness of both medial temporal lobes of the patient is not more than about 25% below the average thickness of the medial temporal lobe of a significant number of normal non-demented controls, **thereby signifying absence of SDAT in said patient**.

-45-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,458,542

**Inventor(s):**  George Jr., et al.
**Assignee:**    Vanderbilt University (Nashville, TN)
**Issue Date:**  October 1, 2002

1. A method of **screening for susceptibility** to a drug-induced cardiac arrhythmia in a subject, the method comprising:

 a) **obtaining a biological sample** from the subject; and

 b) **detecting** a D85N polymorphism of a KCNE1 nucleic acid encoding a cardiac potassium channel minK subunit polypeptide in the biological sample from the subject, the presence of the D85N polymorphism **indicating the susceptibility of the subject** to a drug-induced cardiac arrhythmia.

### *APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,364,793

**Inventor(s):**   Cameron, Sr., et al.
**Assignee:**   Monoclonetics International, Inc. (Houston, TX); The United States of America as represented by the Secretary of the Department of Health and Human Services (Washington, D.C.)
**Issue Date:**   November 15, 1994

4. A method for **obtaining diagnostic information** related to the presence of peripheral nerve damage, comprising

  **subjecting a body fluid sample** of a patient suspected of having peripheral nerve damage to electrophoresis,

  **measuring** the concentration of 1bp13-4.719 to determine an increase in concentration as compared to control samples from patients without peripheral nerve damage as determined by the absence of neurological symptoms, and

  **correlating** the increased concentration of 1bp13-4.719 in the patient's body fluid sample with results from other clinical peripheral nerve damage tests of the patient as an indication of the presence of peripheral nerve damage.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 6,022,683

| | |
|---|---|
| **Inventor(s):** | **Poirier** |
| **Assignee:** | **Nova Molecular, Inc. (Montreal, CA)** |
| **Issue Date:** | **February 8, 2000** |

1. A method for **determining the prognosis** and ability of a patient diagnosed with a non-Alzheimer's disease (non-AD) neurological disease to respond to therapy comprising the following:

   a) **identifying a patient** who has been diagnosed with a non-AD neurological disorder;

   b) **determining the apolipoprotein E (apoE) allele load** of said patient through genotypic or phenotypic methods, said phenotypic methods including determining the apoE protein isoform; and

   c) **utilizing the data** obtained from step b) in a prognostic protocol; wherein the presence of at least one apoE $\epsilon$4 allele in said patient is **indicative** of said patient having a poor prognosis of recovery and a decreased responsiveness to therapy.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 5,955,266

**Inventor(s):**   **Bray, et al.**
**Assignee:**    **The Johns Hopkins University School of Medicine (Baltimore, MD)**
**Issue Date:**   **September 21, 1999**

1. A method for **diagnosing a subject** having or at risk of having a thrombotic disease comprising:

**contacting a target nucleic acid** isolated from a specimen of a subject with a reagent that detects a $Pl^{A2}$ polymorphism in the GPIIIa gene; and

**detecting** the presence or absence of the $Pl^{A2}$ polymorphism, wherein the presence of the polymorphism is indicative of a thrombotic disease.

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. RE 38,352**

| | |
|---|---|
| **Inventor(s):** | **Kozal, et al.** |
| **Assignee:** | **Leland Stanford Junior University (Palo Alto, CA (US))** |
| **Issue Date:** | **December 16, 2003** |

1.  A method of **evaluating the effectiveness** of antiretroviral therapy of an HIV-infected patient comprising:

   (i)  **collecting** a plasma sample from an HIV-infected patient; and

   (ii)  **determining** whether the plasma sample comprises nucleic acid encoding HIV reverse transcriptase having a mutation at codon 215, in which the presence of the mutation **correlates** positively with an accelerated immunologic decline of said patient compared to patients who do not have the mutation.

## *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,179,588

**Inventor(s):**  **Cabral**
**Assignee:**  **Board of Regents of the University of Texas System (Austin, TX)**
**Issue Date:**  **February 20, 2007**

1. A method for **determining the insensitivity** of a patient sample to paclitaxel-like drugs, comprising: (a) obtaining a patient sample; (b) determining if said patient's beta-tubulin comprises an amino acid substitution at one or more of positions 214, 215, 216, 217 or 228 relative to the wildtype sequence; and (c) **correlating** **the presence of said mutation with patient insensitivity** to paclitaxel-like drugs.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,175,981

**Inventor(s):**   **Jett, et al.**
**Assignee:**      **The United States of America as represented by the Secretary of the Army
                   (Washington, DC)**
**Issue Date:**    **February 13, 2007**

1. A method of **diagnosing breast cancer** comprising the steps of:

   a)  obtaining a tissue sample from a subject;

   b)  subjecting the sample to **a detection method for measuring levels** of fatty acid binding
       proteins (FABPs), said FABPs comprising Liver-FABP, Intestine-FABP, Adipose-FABP,
       Epidermal-FABP, and Heart/Muscle FABP;

   c)  **detecting** an amount of said FABP present in said sample of said subject;

   d)  **comparing the amounts of expression** of FABP in the sample to the amounts of expression
       of FABP in a non-cancerous control; and

   e)  **diagnosing a presence of breast cancer by observing if the amounts of expression** of the
       FABP in the sample show that Liver-FABP is up, Intestine-FABP is up, Adipose-FABP is
       down, Epidermal-FABP is down, and Heart/Muscle-FABP is down

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,172,874

| | |
|---|---|
| **Inventor(s):** | **Hollyfield, et al.** |
| **Assignee:** | **The Cleveland Clinic Foundation (Cleveland, OH)** |
| | **Case Western Reserve University (Cleveland, OH)** |
| **Issue Date:** | **February 6, 2007** |

1. A method of **diagnosing an age-related macular degeneration** (AMD) in a test subject, comprising: **determining levels of 2-($\Omega$-carboxyethyl) pyrrole (CEP) adducts in a bodily fluid** obtained from the test subject, **wherein the presence of elevated levels** of CEP adducts in the test subject's bodily fluid as compared to a predetermined value based on levels of CEP adducts found in a corresponding bodily fluid obtained from control subjects **indicates** **that the test subject is more likely to have AMD** than a test subject whose levels of CEP adducts in the bodily fluid are equal to or less than the predetermined value.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,166,469

| | |
|---|---|
| **Inventor(s):** | **Holvoet, et al.** |
| **Assignee:** | **Leuven Research & Development VZW (BE)** |
| **Issue Date:** | **January 23, 2007** |

1. A method **for obtaining an indication of the coronary artery disease state** of an individual, the method comprising:

    a) **obtaining a sample** from the individual; and

    b) (b) **making a comparison** of a level of a marker in the sample with the level of the same marker in a control, the marker being one of the following: (i) a first marker comprising an atherogenic protein comprising oxidized low density lipoprotein (OxLDL), (ii) a second marker comprising an atherogenic protein comprising malondialdehyde-modified low density lipoprotein (MDA-modified LDL), and (iii) a third marker for acute myocardial infarction, such a comparison being made for the second marker and such a comparison being made for at least one of the first marker and the third marker; wherein results obtained from step (b) provide the following indications if such a comparison is made for each of the three markers: [see table of "indication" in claim]

or provide the following indications if such a comparison is made for each of the first and second markers: : [see table of "indication" in claim]

or provide the following indications if such a comparison is made for each of the second and third markers: : [see table of "indication" in claim]

-54-

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,163,801

**Inventor(s):** Reed
**Assignee:** The Burnham Institute (La Jolla, CA)
**Issue Date:** January 16, 2007

1. A method for **determining the prognosis** for survival for a colon cancer patient having stage II colon carcinoma, comprising:

    a) **measuring** a level of TUCAN polypeptide in a colon cancer cell-containing sample from said colon cancer patient, and

    b) **comparing** the level of TUCAN polypeptide in said sample to a reference level of TUCAN polypeptide from normal colon tissue, **wherein a lower level of TUCAN polypeptide relative to said reference level <u>correlates</u> with increased survival of said patient**.

# *APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,160,683

**Inventor(s):**  **Ohtani, et al.**
**Assignee:**     **Genox Research, Inc. (Ibaraki, JP)**
**Issue Date:**   **January 9, 2007**

1. A method of **testing for bronchial asthmatic attack,** said method comprising the steps of:

  a) **measuring the expression level of an indicator gene** in a biological sample from a human subject having a symptom of a bronchial asthmatic attack, wherein said indicator gene is SCCA1, and

  b) **comparing the expression leve**l measured in step a), with that in a biological sample from a human living body not affected by bronchial asthma, **wherein a higher level of SCCA1 in** the biological sample from the subject **indicates** **that the subject is having a bronchial asthma attack.**

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 7,160,681**

**Inventor(s):   Gelfand, et al.**
**Assignee:      National Jewish Medical and Research Center (Denver, CO)**
**Issue Date:    January 9, 2007**

1. A method for **diagnosing breast cancer** in a patient, comprising:

   a) **detecting the level of cdk6 expression** in a breast tissue cell sample from a patient to be diagnosed;

   b) detecting the level of cdk6 expression in a normal control breast tissue cell sample;

   c) **comparing the level of cdk6 expression** detected in step (a) to the level of cdk6 expression detected in step (b); and

   d) determining a difference between the levels of cdk6 expression;

   **wherein a determination of a reduced level of cdk6 expression** in the breast tissue cell sample from a patient to be diagnosed, as compared to the level of cdk6 expression in the normal control breast tissue cell sample, **is <u>indicative</u> of a positive diagnosis of breast cancer** in the patient; and,

   **wherein a determination of an increased or a substantially similar level of cdk6 expression** in the breast tissue cell sample from a patient to be diagnosed, as compared to the level of cdk6 expression in the normal control breast tissue cell sample, **is <u>indicative</u> of a negative diagnosis of breast cancer in the patient.**

*APPENDIX B*
**THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS**

**U.S. Patent No. 7,157,235**

**Inventor(s):** **Breit, et al.**
**Assignee:** **St. Vincent's Hospital Sydney Limited (Sydney, AU)**
**Issue Date:** **January 2, 2007**

1. A **method of diagnosis or predicting the risk of a cardiovascular disease** or event selected from the group consisting of atherosclerosis, myocardial infarction and thromboembolic stroke, the method comprising **detecting an elevated amount of MIC-1 polypeptide of >850 pg/ml in a test body sample** from a human subject, wherein said test body sample is selected from the group consisting of a blood plasma sample, a whole blood sample and a urine sample.

### *APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,157,081

Inventor(s): **Bergmann, et al.**
Assignee: **B.R.A.H.M.S. Aktiengesellschaft (Hennigsdorf, DE)**
Issue Date: **January 2, 2007**

1. A method of differential **early diagnosis and detection for the prognosis** of, **and therapy-accompanying assessment** of the course of sepsis and severe infection in a patient in need thereof, the method comprising providing a biological fluid or a tissue sample from said patient, **detecting and/or determining the presence and/or amount** of human aldose 1-epimerase (A1E; SEQ ID #3) in the biological fluid or tissue sample from said patient, **determining the presence, severity and course of the sepsis and severe infection**, and **evaluating the success** of a therapy of the sepsis or severe infection in said patient.

-59-

*APPENDIX B*
# THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,148,011

| | |
|---|---|
| **Inventor(s):** | **Sugita et al.** |
| **Assignee:** | **Japan as represented by General Director of Agency of National Center for Child Health and Development (Tokyo, JP)  N/A (Tokyo, JP) Eisai Co., Ltd. (Ibaraki, JP) Genox Research, Inc. (Ibaraki, JP)** |
| **Issue Date:** | **December 12, 2006** |

1. A **method of testing for an allergic disease**, said method comprising the steps of: a) **measuring the expression level** of a gene comprising the nucleotide sequence of SEQ ID NO:1 in eosinophil cells of a test subject; and b) **comparing the measured expression level** to the expression level of the gene in eosinophil cells of a healthy subject; **wherein increased expression of SEQ ID NO:1 is indicative** of allergic disease.

-60-

*APPENDIX B*
### THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,148,008

| | |
|---|---|
| **Inventor(s):** | **Hakonarson** |
| **Assignee:** | **deCode genetics ehf. (Reykjavik, IS)** |
| **Issue Date:** | **December 12, 2006** |

1. A **method for diagnosing responders to a glucocorticoid drug** for treating asthma from non-responders to the drug, comprising:

    a) obtaining a sample of cells from a human patient;

    b) optionally inducing a pro-inflammatory-like state by treating the sample with specific mediators;

    c) **obtaining a gene expression profile** from the sample, wherein the expression profile comprises expression values for one or more genes listed in Tables 1, 2A, 2B, 4A, 4B and 5A 5E; and

    d) **comparing the gene expression profile of the sample with a reference gene expression profile indicative of responsiveness** to the drug obtained from one or more patients who are responsive to the drug and/or a reference gene expression profile indicative of non-responsiveness to the drug obtained from one or more patients who are non-responsive to the drug,

**wherein similarity in expression profiles between the sample and reference profiles <u>indicates</u> glucocorticoid sensitivity** in the patient from whom the sample was obtained, thereby diagnosing the patient as a responder or non-responder to the drug.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,141,382

Inventor(s):  **Parikh, et al.**
Assignee:     **Not assigned on its face**
Issue Date:   **November 28, 2006**

1. A **method for diagnosing acute renal failure** in a subject comprising: **identifying a subject having acute respiratory distress syndrome** (ARDS) or acute lung injury (ALI) not currently diagnosed with acute renal failure (ARF); **measuring the concentration of serum creatinine** in the subject; obtaining a urine sample from the subject prior to elevated serum creatinine in the subject, wherein elevated serum creatinine is indicated by a 50% increase of serum creatinine concentration above a baseline concentration of serum creatinine in the subject wherein the baseline serum creatinine is equal to or less than 1.2 mg/dl; assessing the concentration of interleukin 18 (IL-18) protein in the sample; and **diagnosing the presence of ARF in the subject prior to elevated serum creatinine concentration based on an increased concentration** of IL-18 protein in the sample relative to a normal control subject.

*APPENDIX B*
## THIRD-PARTY PATENTS CLAIMING CORRELATIONS AND ASSOCIATIONS

### U.S. Patent No. 7,138,239

**Inventor(s):  Endo, et al.**
**Assignee:    Eisai Co., Ltd. (Tokyo, JP)**
**Issue Date:  November 21, 2006**

1. A **method for testing for multiple organ failure** in a patient with systemic inflammatory response syndrome, which comprises **determining** the level of cytochrome C in blood, plasma, serum or cerebrospinal fluid of said patient and **comparing the determined level with a normal value to** <u>indicate</u> **multiple organ failure in said patient when the determined level of said cytochrome C is increased compared to said normal value.**

# APPENDIX "C"

*APPENDIX C*
## COMPARISON BETWEEN CLAIM 1
## OF THE '623 PATENT AND THE *LAB. CORP.* CLAIM

| Claim 1, '623 Patent | *Lab. Corp.* Claim 13 |
|---|---|
| A method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising:<br><br>(a) administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder; and<br><br>(b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder,<br><br>wherein the level of 6-thioguanine less than about 230 pmol per $8\times10^8$ red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and<br><br>wherein the level of 6-thioguanine greater than about 400 pmol per $8\times10^8$ red blood cells indicates a need to decrease the amount of said drug subsequently administered to said subject. | A method for detecting a deficiency of cobalamin or folate in warm-blooded animals comprising the steps of:<br><br>Assaying a body fluid for an elevated level of total homocysteine; and<br><br>Correlating an elevated level of total homocysteine in said body fluid with a deficiency of cobalamin or folate. |

-1-